UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAROL CONNELLY, | : | |
| Plaintiff, | : | |
| | : | CIVILNO. 3:03CV0551(JCH) |
| v. | : | |
| | : | |
| IKON OFFICE SOLUTIONS, INC. | : | |
| Defendant. | : | APRIL 8, 2004 |

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.

Margaret J. Strange (ct 08212)
strangem@jacksonlewis.com
Holly L. Cini (ct 16388)
cinih@jacksonlewis.com
Jackson Lewis LLP
55 Farmington Avenue
Hartford, CT  06105
Ph: (860) 522-0404
Fx: (860)247-1330

**ORAL ARGUMENT IS REQUESTED**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................i, ii, iii

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   SUMMARY OF ARGUMENT ...................................................................................2

III.  FACTUAL BACKGROUND......................................................................................3

      A.    Plaintiff's Performance Issues ........................................................................4

      B.    Plaintiff's Complaint About The Meeting To Discuss Her Performance
            Issues...............................................................................................................5

      C.    The Wiggin & Dana, LLC Account.................................................................5

      D.    Plaintiff's Complaints Related to the Wiggin & Dana LLC Account ...........7

      E.    Kimberly LaFleur's Sexual Harassment Complaint Against Plaintiff ...........9

      F.    IKON's Response to Plaintiff's Complaints..................................................10

      G.    IKON's Investigation Into Plaintiff's Complaints........................................11

      H.    Plaintiff's Request For A New Supervisor ...................................................13

      I.    Plaintiff's Formal Complaints Against IKON ..............................................15

IV.   STANDARD OF REVIEW ......................................................................................16

V.    DISCUSSION ..........................................................................................................17

      A.    IKON Is Entitled To Summary Judgment On Count One Because The
            Subject Matter of Plaintiff's Speech is Not Constitutionally Protected ......17

      B.    IKON Is Entitled to Summary Judgment on Count One of the Complaint
            Because Plaintiff Does Not Plead or Establish That Her Alleged Exercise
            of Free Speech Did Not Interfere With Her Job Performance Or Her
            Working Relationship With IKON ................................................................22

      C.    IKON Is Entitled to Summary Judgment On Count One Because Plaintiff
            Was Neither Disciplined Nor Discharged ....................................................24

       D.      Even If Plaintiff's Speech Relates To Matters of Inherent Public Concern, IKON Is Entitled To Summary Judgment On Count One Because Plaintiff's Claims Fall Within the Exclusive Jurisdiction of the Connecticut Fair Employment Practices Act......................................................................................28

       E.      IKON is Entitled To Costs And Attorney's Fees Because Plaintiff Brought a Claim Under C.G.S. § 31-51q Without Substantial Justification ........................30

       F.      IKON Is Entitled To Summary Judgment On Count Two Because The Alleged Conduct Was Not Extreme And Outrageous ...........................................31

VI.     CONCLUSION...........................................................................................................36

## TABLE OF AUTHORITIES

**Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................................16

Appleton v. Board of Educ. of Stonington, 254 Conn. 205 (2000) ................................................31

Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643 (1985) ....................................................29

Aquavia v. Goggin, 208 F. Supp. 2d 225 (D. Conn. 2002) ..........................................................34

Broughton v. Connecticut Student Loan Foundation, 64 F. Supp. 2d 64
(D. Conn. 1999) ...........................................................................................................................26

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) ...............................................................26

Callaway v. Hafeman, 832 F.2d 414 (7th Cir. 1987) ....................................................................20

Catalano v. Bedford Assoc., Inc., 9 F. Supp. 2d 133 (D. Conn. 1998) ........................................30

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) cert. denied, 484 U.S. 1066 (1988) ......................16

Connick v. Myers, 461 U.S. 138 (1983) ........................................................................................17

Cotto v. United Technologies Corp., 48 Conn. App. 618 (1998) ..................................................22

D'Alton v. Canterbury School, No. 0054069,
1991 Conn. Super. LEXIS 1576 (Conn. Super. Ct. July 3, 1991) ................................................24

D'Angelo v. McGoldrick, No. CV9360063904, 1995 Conn. Super. LEXIS 2305,
(Conn. Super. Ct. Aug. 3, 1995) aff'd. 239 Conn. 356 (1996) ....................................................26

Daley v. Aetna Life & Casualty Co., 249 Conn. 766 (1999) ........................................................17

Darnell v. Campbell Country Fiscal Court, 731 F. Supp. 1309 (E.D. Ky 1990)
aff'd, 924 F.2d 1057 (6th Cir. 1991) ............................................................................................25

DeLeon v. Little, 981 F. Supp. 728 (D. Conn. 1997) ....................................................................33

Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54 (2d Cir. 1987) ..............17

Emanuele v. Baccaccio & Susanin, No. CV 900379667S,
1994 Conn. Super. LEXIS 3156 (Conn. Super. Ct. Dec. 1, 1994) ................................................34

Emerick v. Kuhn, 52 Conn. App. 724 (1999) ..........................................................................18, 19

Galabya v. New York City Board of Educ., 202 F.3d 636 (2d Cir. 2000) .....................................25

Hood v. Aerotek Inc., No. 3:98CV1524, 2002 U.S. Dist. LEXIS 3513
(D. Conn. Feb. 20, 2002) ...........................................................................................32

Huff v. West Haven Board of Educ., 10 F. Supp. 2d 117 (D. Conn. 1998) ...................................34

Knight v. U.S. Fire Ins. Co., 804 F.2d 9 (2d Cir. 1986) cert. denied,
480 U.S. 932 (1987)...................................................................................................16

Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876 (6th Cir. 1996).................................................25

Lowe v. Amerigas, 52 F. Supp. 2d 349 (D. Conn. 1999) aff'd 208 F. 3d 203
(2d Cir. 2000)...................................................................................................18, 19, 24

Reed v. Town of Branford, 949 F. Supp. 87 (D. Conn. 1996)........................................................32

Rock v. Mott Metallurgical Corp., No. CV 99 0492215S,
2001 Conn. Super. LEXIS 207 (Conn. Super. Ct. Jan. 10, 2001) ...................................................33

Sierra v. State, No. CV000803588S, 2001 Conn. Super. LEXIS 1604
(Conn. Super Ct. June 4, 2001)........................................................................................23

Sherman v. Sedgwick James of Connecticut, No. CV26150,
1997 Conn. Super. LEXIS 349, (Conn. Super. Ct. Feb. 10, 1997).................................................23

Simko v. Ervin, 234 Conn. 498 (1995) ...................................................................................30

Sullivan v. Board of Police Commissioners, 196 Conn. 208 (1985)...............................................29

Urashka v. Griffin Hosp., 841 F. Supp. 468 (D. Conn. 1994)..................................................17, 20

White v. Martin, 23 F. Supp. 2d 203 (D. Conn. 1998) .................................................................30

Williams v. Bayer Corp., 982 F. Supp. 120 (D. Conn. 1997)........................................................24

Winik-Nystrup v. Manufacturers Life Ins. Co., 8 F. Supp. 2d 157 (D. Conn. 1998) .....................24

## OTHER

C.G.S. § 31-51q ...........................................1, 2, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31

C.G.S. § 46a-60(a)(4)...................................................................................................28

C.G.S. § 46a-60(a)(1)...................................................................................................28

C.G.S. § 46a-60(a)(5)...................................................................................................28

C.G. S. §§ 46a-84 and 86...............................................................................................29

C.G.S. § 46a-100 ..................................................................................................................29

C.G. S. § 46a-99 ...................................................................................................................29

C.G.S. § 46a-101 ..................................................................................................................29

Connecticut Fair Employment Practices Act, 46a-58 *et seq*..................................................2, 28, 29

UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAROL CONNELLY, | : | |
| Plaintiff, | : | |
| | : | CIVIL NO. 3:03CV0551(JCH) |
| v. | : | |
| | : | |
| IKON OFFICE SOLUTIONS, INC. | : | |
| Defendant. | : | APRIL 8, 2004 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.    PRELIMINARY STATEMENT

Defendant, IKON Office Solutions, Inc. ("IKON") submits this Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiff Carol Connelly's complaint. The undisputed facts underlying this matter establish there is no genuine issue as to any material fact that would prevent the entry of summary judgment on both counts of the complaint. Also filed simultaneously herewith and attached in support of Defendant's Motion is Defendant's Local Rule 56(a)1 Statement; excerpts from the deposition of Plaintiff, taken on February 24, 2004 (Exhibit A-2); the Affidavit of Sarah Allen (Exhibit B); the Affidavit of Kimberly Fordham (Exhibit C); the Affidavit of Kimberly LaFleur (Exhibit D); the Affidavit of Mai White (Exhibit E); the Affidavit of Tom Magel (Exhibit F); the Affidavit of Jim Morrissey (Exhibit G); the Affidavit of Joseph Manglass (Exhibit H); and other documentary exhibits.

II.    SUMMARY OF ARGUMENT

Plaintiff's two count complaint alleges violation of Connecticut General Statutes Section 31-51q (Count One) and Intentional Infliction of Emotional Distress (Count Two). Plaintiff claims that during the course of her employment at IKON, she was disciplined in retaliation for having complained that a co-worker sexually harassed her and for complaining about IKON's hiring practices.

IKON is entitled to summary judgment on Plaintiff's C.G.S. § 31-51q claim because none of Plaintiff's complaints relate to matters of public concern warranting constitutional protection. Plaintiff's statements were about the terms and conditions of her employment, which is not speech protected under the First Amendment to the United States Constitution or the analogous provision of the Connecticut Constitution. In addition, even if Plaintiff's speech warranted constitutional protection, Plaintiff does not allege and cannot establish that IKON retaliated against her on the basis of these complaints. In fact, Plaintiff does not allege nor can she establish that IKON took any adverse employment action against her at all.

Count One is also subject to summary dismissal because to the extent any of Plaintiff's complaints can be interpreted to constitute claims of sexual harassment or race or disability discrimination in the workplace, claimed retaliation for making such complaints falls within the primary and exclusive jurisdiction of the Connecticut Fair Employment Practices Act, 46a-58 *et seq.* Plaintiff thus has not exhausted the requisite administrative remedies necessary to file these claims. Her failure to do so deprives this Court of jurisdiction over this case. Because Plaintiff's institution of this action pursuant

to C.G.S. § 31-51q was wholly without justification, IKON is entitled to attorney's fees and costs expended in defense of this matter.

Plaintiff's Intentional Infliction of Emotional Distress claim set forth in Count Two also fails as a matter of law. Plaintiff's claims that IKON employees met with her on a few occasions to investigate and resolve her complaints and, on one occasion, apologized for keeping her so long, do not constitute examples of the extreme or outrageous behavior necessary to support an emotional distress claim.

For all of these reasons, IKON's motion for summary dismissal of Plaintiff's complaint should be granted.

III.    FACTUAL BACKGROUND

IKON Office Solutions, Inc. is a provider of products and services that help businesses communicate. IKON provides business solutions for office, production, and outsourcing needs, including copiers and printers, color solutions, distributed printing, facilities management, imaging and legal document solutions, as well as network design and consulting and e-business development. Among other services, IKON provides outsourcing employment services to various Connecticut businesses. Businesses contract with IKON to employ an on-site staff to handle certain administrative functions such as document copying, filing, secretarial support, and reception tasks.

IKON hired Plaintiff on November 18, 2002 as a Corporate Recruiter/Trainer for the Southwestern Connecticut territory. (Compl. ¶ 3).[1] This

---

[1] Plaintiff instituted this action by filing an Application for Prejudgment Remedy and Complaint on or about March 13, 2003. Defendant removed the matter to this Court on March 27, 2003. Plaintiff did not object to that removal. Defendant filed an Answer and Affirmative Defenses to the Complaint on April 11, 2003. During a telephonic status conference on December 5, 2003, this Court (Hall, J.) denied Plaintiff's Application for Prejudgment Remedy, and entered a scheduling order under which the parties were to proceed in the litigation. References to Plaintiff's Complaint refer to the document titled "Complaint" that was filed with Plaintiff's Application for Prejudgment Remedy. A copy of that Complaint is attached as

territory included Milford and Stamford.  (Pl.'s Dep. p. 148; Exhibit B, ¶ 4).[2]  In this position, Plaintiff was expected to train client's employees on the proper use of IKON office products.  (Compl. ¶ 4).  Plaintiff was also supposed to recruit candidates for open positions at IKON's client's worksites.  (Compl. ¶ 4).

### A.    Plaintiff's Performance Issues

Less than two months into Plaintiff's tenure, co-workers began lodging complaints with Kimberly Fordham, Plaintiff's supervisor, about Plaintiff's performance. (Exhibit C ¶ 3).[3]  Specifically, Plaintiff's co-workers reported that Plaintiff was having difficulty presenting, understanding, and organizing herself, and that she was having difficulty developing a positive, professional attitude with customers and peers.  (Exhibit C ¶4). On January 23, 2003, Ms. Fordham and her supervisor, Richard Silva, met with Plaintiff to discuss these reported concerns. (Exhibit C ¶ 5; Compl. ¶ 30).  In preparation for the meeting, Ms. Fordham and Mr. Silva drafted an "Employee Counseling Report" containing the concerns that had been reported to them.    (Exhibit C-1, *Employee Counseling Report*).  After discussing the contents of the Employee Counseling Report with Plaintiff, Mr. Silva ripped it up and did not issue it to Plaintiff.  Plaintiff testified that at the end of this meeting, Ms. Fordham stated that the meeting should not have

---

Exhibit A-1 to the Affidavit of Margaret J. Strange, Esq., dated April 7, 2004 ("Strange Affidavit"), filed simultaneously herewith and is attached hereto as Exhibit A.  The Complaint is hereinafter referenced as "Compl., ¶ __."

[2] Copies of relevant pages from Plaintiff's certified deposition transcript are attached to the Strange Affidavit as Exhibit A-2.  Plaintiff's deposition is hereinafter referred to as "Pl. Dep. p. ___".  The Affidavit of Sarah Allen dated April __, 2004 ("Allen Affidavit"), was filed simultaneously herewith and is attached hereto as Exhibit B.  Paragraphs of the Allen Affidavit are hereinafter referenced as "Exhibit B ¶ __;" documents appended to the Allen Affidavit are hereinafter referenced as "Exhibit B – __."

[3] The Affidavit of Kimberly Fordham dated April 5, 2004 ("Fordham Affidavit") was filed simultaneously herewith and is attached hereto as Exhibit C.  Paragraphs of the Fordham Affidavit are hereinafter referenced as "Exhibit C ¶ __;" documents appended to the Fordham Affidavit are hereinafter referenced as "Exhibit C- __"

4

happened and that Ms. Fordham and Mr. Silva both apologized to her. (Pl.'s Dep. pp. 122-123).

B.     Plaintiff's Complaint About The Meeting To Discuss Her Performance Issues

By e-mail dated two days later, on Saturday, January 25, 2003, Plaintiff contacted Sarah Allen, the Human Resources Manager for IKON's Connecticut Marketplace, and carbon copied Kimberly Fordham and Richard Silva. (Exhibit B-1: *January 25, 2003 e-mail from Plaintiff to Sarah Allen regarding Meeting on 1.23.03*). In that e-mail, Plaintiff complained that the January 23, 2003 meeting was "unmerited, unjust, insulting and harassment." (Exhibit B-1). Plaintiff requested a meeting with Ms. Allen to discuss Ms. Fordham's and Mr. Silva's actions during the meeting. (Exhibit B-1).

C.     The Wiggin & Dana, LLC Account

One of Plaintiff's initial recruiting assignments was for a receptionist position in the Stamford office of Wiggin & Dana LLC, an IKON client. (Compl. ¶ 5). Kimberly LaFleur, an IKON Senior Integrated Account Manager, was the designated liaison between Wiggin & Dana and IKON. (Compl. ¶ 6). Trudy Muhlbauer, the Human Resources Director for Wiggin & Dana, LLC, was the client contact with whom IKON was working to fill the position. (Exhibit D ¶ 5; Compl. ¶ 15).[4]   Plaintiff began recruiting candidates for the Wiggin & Dana Receptionist position in early December of 2002. (Compl. ¶ 5). Throughout that month, Plaintiff participated in a number of

---

[4] The Affidavit of Kimberly LaFleur dated April 5, 2004 ("LaFleur Affidavit") was filed simultaneously herewith and is attached hereto as Exhibit D. Paragraphs of the LaFleur Affidavit are hereinafter referenced as "Exhibit D ¶ __;" documents appended to the LaFleur Affidavit are hereinafter referenced as "Exhibit D - __.

candidate interviews with Kimberly LaFleur. (Compl. ¶ 6). Plaintiff also participated in a few candidate interviews with Tom Magel, an IKON Operations Manager. (Compl. ¶ 8). By mid-January Plaintiff had failed to provide any acceptable candidates for the receptionist position. (Exhibit D ¶ 7).[5]

On January 22, 2003, while Plaintiff was still trying to recruit candidates for the Receptionist position at Wiggin & Dana, Plaintiff asked Ms. LaFleur why three candidates she had presented were not offered the position. (Exhibit D-1 *January 22, 2003 e-mail from Plaintiff to Kimberly LaFleur*). In an e-mail dated January 24, 2003, Ms. LaFleur responded by providing the reasons for each candidate's rejection. (Exhibit D-2 *January 24, 2003 e-mail from Kimberly LaFleur to Plaintiff*). Ms. LaFleur explained that one candidate was not hired because Plaintiff had ignored protocol and sent the candidate directly to Wiggin & Dana without first scheduling an interview with Ms. LaFleur or completing an IKON application. (Exhibit D-2). With respect to the other two candidates, Ms. LaFleur explained that neither she nor the Wiggin & Dana contact, Trudy Muhlbauer, felt they possessed the professional qualities needed to be a receptionist for the firm. (Exhibit D-2). In that e-mail, Ms. LaFleur also informed Plaintiff that she had contacted an outside recruiting agency, Spherion, and that agency had found several other candidates with whom she and Ms. Muhlbauer would be meeting the following week. (Exhibit D-2). The overwhelming majority of the candidates Ms. LaFleur and Ms. Muhlbauer interviewed for the position were black. (Exhibit D ¶ 11). One of those candidates was Mona Jackson, a black female. (Exhibit D ¶ 11). The IKON employee who previously held the receptionist position at Wiggin & Dana was black. (Exhibit D ¶

---

[5] IKON eventually contacted Spherion, an outside employee recruiting agency, to fill the position. Using an outside recruiting agency is not a common or favored practice at IKON because it incurs unnecessary costs. (Exhibit D ¶ 10).

11). The three finalists for the position were black. (Exhibit D ¶ 11). The candidate IKON hired, with Wiggin & Dana's input, was black. (Exhibit D ¶ 11).

      D.      <u>Plaintiff's Complaints Related to the Wiggin & Dana LLC Account</u>

              In an e-mail dated Saturday, January 25, 2003, Plaintiff accused Ms. LaFleur of lying about the reasons why candidates were rejected. (Exhibit D-3 *January 25, 2003 e-mail from Plaintiff to Kimberly LaFleur*). Specifically, Plaintiff wrote that she had earlier asked Ms. LaFleur in person why candidates were being declined. (Exhibit D-3). Plaintiff claimed that in person, Ms. LaFleur had "referred to Ms. Muhlbauer" and said Ms. Muhlbauer did not "want another girl from the 'ood at the front desk" and did not want "someone wearing those muffin hats and pronouncing the firm as Wigga' and Dannna." (Exhibit D-3). In this e-mail Plaintiff also stated that Tom Magel had commented to her that one candidate was "sexy" and another candidate "needed too much dental work." (Exhibit D-3). Plaintiff also claimed that Tom Magel would not hire a third candidate because she had a "heart condition" and he did not want to take the risk that she "might be at the doctors all the time." (Exhibit D-3). Tom Magel, Kimberly Fordham, Richard Silva, and Sarah Allen, the Human Resources Manager for IKON's Connecticut Marketplace, were carbon copied on this e-mail. (Exhibit D-3).

              Plaintiff testified she also complained about the procedures used to conduct the candidate interviews. Specifically, Plaintiff testified that she complained Ms. LaFleur and Mr. Magel did not take notes during interviews and did not interview each candidate for an identical amount of time. (Pl.'s Dep. pp 101-102). Plaintiff also testified that she complained that Ms. LaFleur offered one candidate, Mona Jackson, the position before all of the other candidates were interviewed. (Pl.'s Dep. pp. 155, 163).

Mona Jackson, who Plaintiff claims was offered the receptionist position by Ms. LaFleur, is black. (Exhibit D ¶ 11). Plaintiff claims that these complaints regarding the Wiggin & Dana receptionist position form the basis for her retaliation claim.

In her deposition, Plaintiff articulated the basis of her lawsuit to redress her complaints as follows:

> Q:    Is that the basis for your lawsuit?
>
> A:    No. [T]he basis for the lawsuit is that, in reporting a hiring practice that is not legal, I was retaliated upon, and in being retaliated upon, I suffered time out of work. That's what it's about.
>
> Q:    And you said that in reporting a hiring practice that was not legal. What hiring practice is that that you claim you reported?
>
> A:    Offering a position to a candidate before interviewing the other candidates. (Pl.'s Dep. pp. 192-193).
>
> Q:    So your complaint with Kim LaFleur is that she offered the position to Mona Jackson on the spot without interviewing others, correct?
>
> A:    Correct. It's the hiring procedure, not racism, the hiring procedure. (Pl.'s Dep. p. 161).

In an e-mail dated January 28, 2003, Plaintiff contacted Jim Morrissey, IKON's Connecticut Marketplace Vice President/General Manager. (Exhibit E-1 *January 28, 2003 e-mail from Plaintiff to Jim Morrissey*).[6] Plaintiff's e-mail to Mr. Morrissey reiterated her complaints about the hiring procedures employed on the Wiggin & Dana account. (Exhibit E-1). Plaintiff carbon copied Paul Lee, IKON's Connecticut Marketplace Director of Financial Operations and John Hart, IKON's District Director of Outsourcing and attached her original e-mail complaint to the message. (Exhibit E-1). In

---

[6] The Affidavit of Jim Morrissey dated April 7, 2004 ("Morrissey Affidavit") was filed simultaneously herewith and is attached hereto as Exhibit E. Paragraphs of the Morrissey Affidavit are hereinafter referenced as "Exhibit E ¶ __;" documents appended to the Morrissey Affidavit are hereinafter referenced as "Exhibit E - __.

an e-mail dated immediately thereafter, Plaintiff sent an e-mail directly to Trudy Muhlbauer, the client representative at Wiggin & Dana, LLC. (Exhibit F-1 *January 28, 2003 e-mail from Plaintiff to Trudy Muhlbauer*).[7]   In that e-mail, Plaintiff accused Ms. Muhlbauer of asking "for a white male or female specifically" to fill the receptionist position. (Exhibit F-1). Plaintiff attached her original e-mail dated January 25, 2003 to the e-mail dated January 28, 2003 e-mail to Ms. Muhlbauer. (Exhibit F-1). On January 29, 2003, Trudy Muhlbauer forwarded Plaintiff's message to Mr. Magel and expressed her anger at what she referred to as Plaintiff's "forgery" and baseless accusations. (Exhibit F-2). Mr. Magel forwarded Ms. Muhlbauer's e-mail to Mr. Morrissey. (Exhibit F-2). By e-mail dated January 29, 2003, Mr. Morrissey informed Plaintiff that he was "very concerned" about the interference Plaintiff's actions may have had with IKON's relationship with Wiggin & Dana, and demanded that she cease corresponding with the client until she met with Sarah Allen. (Exhibit E-2).

E.      Kimberly LaFleur's Sexual Harassment Complaint Against Plaintiff

On Friday, January 24, 2003, Kimberly LaFleur contacted Sarah Allen and claimed that Plaintiff had been sexually harassing her. (Exhibit B-2 *Sarah Allen notes from January 24, 2003 telephone conversation with Kimberly LaFleur*). Specifically, Ms. LaFleur claimed that Plaintiff was regularly calling her at home during non-work hours even though Ms. LaFleur had asked her not to. (Exhibit B-2). Ms. LaFleur also complained that Plaintiff was constantly asking her out for drinks, even though Ms. LaFleur had said no to her requests on a number of occasions. (Exhibit B-2). When

---

[7] The Affidavit of Tom Magel dated April 6, 2004 ("Magel Affidavit") was filed simultaneously herewith and is attached hereto as Exhibit F   Paragraphs of the Magel Affidavit are hereinafter referenced as "Exhibit F ¶ __;" documents appended to the Magel Affidavit are hereinafter referenced as "Exhibit F - __.

Plaintiff discovered that Ms. LaFleur had a female partner, Ms. LaFleur complained that Plaintiff began asking her about gay bars in the area and discussing her personal life and sexual orientation at length, despite the fact that Ms. LaFleur had asked her not to do so. (Exhibit B-2).  Ms. LaFleur reported that Plaintiff regularly questioned her about her personal life and constantly hovered around her cubicle area.  (Exhibit B-2).  Ms. LaFleur complained that Plaintiff's "too physically close" proximity and "relentless pursuit" by Plaintiff upon discovery of Ms. LaFleur's sexual orientation caused her significant discomfort.  (Exhibit B-2).

        F.      <u>IKON's Response to Plaintiff's Complaints</u>

On Monday, January 27, 2003, Sarah Allen responded to both Plaintiff's January 25, 2003 e-mail complaining about the meeting with Ms. Fordham and Mr. Silva and her January 25, 2003 e-mail complaining about the hiring practices used for the Wiggin & Dana account.  (Exhibit B-3 *January 27, 2003 e-mail from Sarah Allen to Plaintiff*).  Ms. Allen requested that Plaintiff call her as soon as possible to schedule a meeting to discuss her concerns.  (Exhibit B-3).  On January 28, 2003, Plaintiff sent an e-mail to Ms. Allen informing her that she was taking a leave of absence from work through February 3, 2003, and would like to wait until then to meet with her.  (Exhibit B-4 *January 28, 2003 e-mail from Plaintiff to Sarah Allen*).  By e-mail dated January 31, 2003, Plaintiff notified Ms. Allen that she would remain out of work until February 10, 2003.  (Exhibit B ¶ 11).  Ms. Allen scheduled a 10:00 a.m. meeting with Plaintiff on that date to discuss her concerns.  (Exhibit B ¶ 11).  Ms. Allen received a voice mail message from Plaintiff at 9:20 a.m. on February 10, 2003 indicating that Plaintiff would not be returning to work that day.  (Exhibit B-5 *February 12, 2003 letter from Ms. Allen to*

*Plaintiff*). Plaintiff indicated that she would not be returning to work until February 13, 1003. (Exhibit B-5). Ms. Allen re-scheduled the meeting with Plaintiff for February 14, 2003. (Exhibit B-5). On February 12, 2003, Plaintiff informed Ms. Allen that she would be out of work until February 19, 2003. (Exhibit B ¶ 14). By letter dated February 13, 2003, Ms. Allen requested that Plaintiff contact her by the close of business on February 17, 2003 to arrange a meeting. (Exhibit B-6 *February 13, 2003 letter from Ms. Allen to Plaintiff*).

G.    IKON's Investigation Into Plaintiff's Complaints

Ms. Allen proceeded with an investigation into the concerns raised by Plaintiff. On February 18, 2003, Ms. Allen interviewed Tom Magel, Kimberly LaFleur, and Kimberly Fordham. (Exhibit B-7 *February 18, 2003 Sarah Allen Investigation Notes*). That same day, Plaintiff left Ms. Allen a voice mail message in which she stated she did not want Ms. Allen to conduct the investigation into her claims. (Exhibit B ¶ 18). Plaintiff insisted on a meeting with an alternative human resources representative. (Exhibit B ¶ 18). Ms. Allen's supervisor, the Regional Human Resources Director, Mai White, take over the investigation into Plaintiff's complaints.

Plaintiff returned to work on February 27, 2003 to meet with Mai White. (Exhibit G-1 *Mai White's Notes from February 27, 2003 meeting with Plaintiff*). [8]  Ms. White met with Plaintiff on that date to discuss/investigate three issues:  Plaintiff's complaint regarding the performance counseling meeting; Plaintiff's complaint of alleged discriminatory hiring practices; and Ms. LaFleur's sexual harassment complaint against Plaintiff. (Exhibit G-1). When Ms. White informed Plaintiff that Ms. LaFleur had

---

[8] The Affidavit of Mai White dated April 6, 2004 ("White Affidavit") was filed simultaneously herewith and is attached hereto as Exhibit G. Paragraphs of the White Affidavit are hereinafter referenced as "Exhibit G ¶ __;" documents appended to the White Affidavit are hereinafter referenced as "Exhibit G - __.

lodged a complaint against her, Plaintiff immediately raised a complaint of sexual harassment against Ms. LaFleur. (Exhibit G-1). Ms. White discussed and investigated this complaint with Plaintiff during this meeting as well. (Exhibit G-1). At the end of the meeting, at Plaintiff's request, Ms. White agreed to allow Plaintiff to remain out of work and to pay her pending investigation of the four complaints. (Exhibit G-1).

After her lengthy meeting with Plaintiff, Ms. White spent a "tremendous amount of time" interviewing everyone Plaintiff identified as "involved" in the issues about which she complained. (Pl.'s Dep. p. 130). On March 4, 2003, Ms. White interviewed Kimberly LaFleur, Tom Magel, and Richard Silva. (Exhibit G-2 *Ms. White's interview notes*). Ms. White also reviewed Ms. Allen's notes from interviews with these individuals. (Exhibit B-7 *Ms. Allen's investigation notes that Ms. White reviewed*). In addition to the interviews, Ms. White gathered empirical data regarding the hiring practices on the Wiggin & Dana account. (Exhibit G ¶ 7). Ms. White discovered that the overwhelming majority of the candidates interviewed for the position were black. (Exhibit G ¶ 7). She also noted that the IKON employee who previously held the Receptionist position at Wiggin & Dana was black, that the three finalists for the position were black, and that a black female had been hired to fill the position. (Exhibit G ¶ 7).

On March 7, 2003, Ms. White met with Plaintiff to discuss the results of her investigation with Plaintiff. (Exhibit G-3 *Ms. White's notes from March 7, 2003 meeting with Plaintiff*). During that meeting, Ms. White explained to Plaintiff that her investigation did not reveal evidence sufficient to support either the sexual harassment complaint made by Plaintiff against Ms. LaFleur or the sexual harassment complaint made by Ms. LaFleur against Plaintiff. (Exhibit G-3). In resolution of both complaints,

Ms. White advised Plaintiff and Ms. LaFleur to limit their discussions to work-related activities. (Exhibit G-3). Ms. White also informed Plaintiff that there was no evidence to substantiate her claims of racial discrimination on the Wiggin & Dana account. (Exhibit G-3). Ms. White told Plaintiff she had interviewed all IKON employees involved in hiring for the Wiggin & Dana account, and none of them had knowledge or information that supported Plaintiff's claim of race discrimination. (Exhibit G-3). Ms. White shared with Plaintiff that she had discovered the overwhelming majority of the candidates interviewed for the position were black; that the IKON employee who previously held the receptionist position at Wiggin & Dana was black; that the three finalists for the position were black; and that a black female had been hired to fill the position. (Exhibit G-3).

Ms. White's investigation and ultimate resolution had "essentially solved the issue." (Pl.'s Dep. p. 130). This was a satisfactory resolution to Plaintiff. (Pl.'s Dep. p. 137). At the close of the meeting, Ms. White informed Plaintiff that she should return to work on Monday, March 10, 2003. At Plaintiff's request, Ms. White memorialized their conversation and via e-mail later that day sent Plaintiff a letter titled "Resolution of Complaint." (Exhibit G-4). Ms. White told Plaintiff to contact her immediately if she had any concerns in the future. (Exhibit G-4).

    H.    <u>Plaintiff's Request For A New Supervisor</u>

During Plaintiff's initial meeting with Ms. White on February 27, 2003, she requested that she be transferred to a new supervisor at a new worksite. (Exhibit G ¶ 3). Despite the lack of evidence to support any of Plaintiff's complaints, Ms. White informed Plaintiff during their March 7, 2003 resolution meeting that IKON agreed to accommodate Plaintiff's transfer request. (Exhibit G-4). Ms. White told Plaintiff that

she should report to work in Stamford upon her return on March 10, 2003, and report to Joseph Manglass, Area Recruiting Manager. (Exhibit G-4). Plaintiff agreed to do so. (Exhibit G ¶ 12).

The following day, Saturday, March 8, 2003, Plaintiff sent an e-mail to Ms. White indicating that she would like her to make changes to the "Resolution of Complaint" letter because she was "highly uncomfortable" with the way the "situation with Kim LaFleur was represented." (Exhibit G-5 *March 8, 2003 e-mail from Plaintiff to Ms. White*). Plaintiff indicated she wanted changes made to the "Resolution of Complaint" letter before it became an "ending document." (Exhibit G-5). Plaintiff carbon copied Sarah Allen on this e-mail. (Exhibit G-5). Because Ms. White was on vacation, Ms. Allen responded to Plaintiff's e-mail on Tuesday, March 11, 2003. (Exhibit B-8 *March 11, 2003 e-mail from Ms. Allen to Plaintiff*). Ms. Allen informed Plaintiff that the Resolution of Complaint was not a draft. She stated that Plaintiff's complaints had been thoroughly investigated and the Resolution of Complaint letter memorialized IKON's final resolution of the matters. (Exhibit B-8). Ms. Allen reiterated that in an effort to accommodate Plaintiff and address her concerns about reporting to the Milford location, IKON changed her assigned work site. (Exhibit B-8). Ms. Allen stated that if Plaintiff would like to continue to report to the Milford location that "too could be arranged." (Exhibit B-8).

On March 15, 2003, Plaintiff reported to work at the Stamford location. Plaintiff testified that she was "happy" and "excited" that she was transferred to a new supervisor. (Pl.'s Dep. p. 130-131). From March 31, 2003 through April 4, 2003,

Plaintiff attended an IKON-sponsored training in New York City.  (Exhibit H ¶ 6).[9]
Plaintiff had requested this training from her new supervisor in the Stamford office,
Joseph Manglass.  (Exhibit H ¶ 6).  After two days at the training, Plaintiff complained
about the commute to New York City.  (Exhibit H ¶ 7).  In response to Plaintiff's
complaint, IKON offered to pay for a hotel room for her in New York City.  (Exhibit H ¶
8).

On June 11, 2003, Plaintiff stopped reporting to work at IKON because
her attorney told her to.  (Pl.'s Dep. pp. 142; 144-145).  No one at IKON told Plaintiff not
to return to work.  (Pl.'s Dep. pp. 142, 144-145).

I.      Plaintiff's Formal Complaints Against IKON

By complaint dated March 28, 2003, Plaintiff filed a charge against IKON
with    the    Connecticut    Commission    on    Human    Rights    and    Opportunities
("Commission").[10]   In that complaint, Plaintiff charged IKON with sexual harassment,
aiding and abetting discrimination, and retaliation in violation of the Connecticut Fair
Employment Practices Act and Title VII of the Civil Rights Act of 1964 (as amended).
The Commission's investigation into Plaintiff's claims is currently pending.  On April 14,
2003, Plaintiff filed a separate complaint against IKON and Wiggin & Dana, LLC with
the Equal Employment Opportunities Commission ("EEOC").[11]   In that complaint,
Plaintiff charged IKON with race, color, sex, and disability discrimination as well as

---

[9] The Affidavit of Joseph Manglass dated April 7, 2004 ("Manglass Affidavit") was filed simultaneously
herewith and is attached hereto as Exhibit H.  Paragraphs of the Manglass Affidavit are hereinafter
referenced as "Exhibit H ¶ __."

[10] A true and correct copy of the complaint Plaintiff filed with the Commission is attached to the Strange
Affidavit as Exhibit A-3.

[11] A true and correct copy of the complaint Plaintiff filed with the EEOC is attached to the Strange
Affidavit as Exhibit A-4.

retaliation. The EEOC's investigation into Plaintiff's claims is currently pending. Plaintiff initiated the instant action by filing an Application for Prejudgment Remedy and complaint in Connecticut Superior Court on or about March 13, 2003. IKON removed the case to this Court on March 27, 2003.

IV.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if the record presented to the Court shows that there is no genuine issue as to any material fact in the case. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986) cert. denied, 484 U.S. 1066(1988). "Properly used, summary judgment permits a court to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987) (citation omitted). Defendant's burden of establishing that there is no genuine issue of material fact in dispute is satisfied if it can point to an absence of evidence to support an essential element of plaintiff's claim. Celotex, 477 U.S. at 322-23. In order to defeat summary judgment, the plaintiff must present evidence that would be sufficient to support a jury verdict in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

Plaintiff's claims here are insufficient to create a genuine issue of material fact for trial. Accordingly, as a matter of law, summary dismissal of her complaint is warranted.

16

V.    DISCUSSION

    A.    IKON Is Entitled To Summary Judgment On Count One Because The Subject Matter of Plaintiff's Speech is Not Constitutionally Protected

Count One is subject to dismissal law because none of Plaintiff's complaints relate to matters of public concern warranting constitutional protection. The Constitution "does not protect speech on purely private matters, such as the terms and conditions of employment." Urashka v. Griffin Hosp., 841 F. Supp. 468, 474 (D. Conn. 1994) (citing Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). By its own terms, Conn. Gen. Stat. § 31-51q protects only those rights guaranteed by the First Amendment of the United States Constitution or, inter alia, the analogous provision of Section 4 of Article First of the Connecticut Constitution.[12] To constitute constitutionally protected speech, a statement must relate to a matter of public concern as opposed to private or personal matters. Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 782 (1999); see also Connick v. Meyers, 461 U.S. 138, 147 (1983).[13] The question of whether the subject matter of speech is a matter of public concern that may form the basis of a constitutionally cognizable claim is a matter of law for the court to decide. Daley, 249 Conn. 766.

Constitutionally protected matters of public concern are those topics that relate to issues of political, social, or other concern to the community. Connick, 461 U.S. at 146; see also Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987) (assessing whether speech warranted constitutional protection by

---

[12] In relevant part, the First Amendment to the United States Constitution states: "Congress shall make no law . . . abridging the freedom of speech . . .". Article first, Section 4 states: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[13] In determining whether employees' speech is protected by §31-51q, courts turn for guidance to cases involving First Amendment claims brought by employees pursuant to 42 U.S.C. §1983. Urashka v. Griffin Hosp., 841 F. Supp. 468 (D. Conn. 1994).

looking at whether it related to "topical concerns in our society"). If, by contrast, speech relates "solely to an employee's personal employment situation and/or is so communicated as to affect only the private adjustment of the employee's personal grievances," it is not constitutionally protected. Daley at 249 Conn. at 782; see also Urashka, 841 F. Supp. at 473; Lowe v. Amerigas, 52 F. Supp. 2d 349 (D. Conn. 1999) aff'd 208 F. 3d 203 (2d Cir. 2000); Emerick v. Kuhn, 52 Conn. App. 724 (1999).

Plaintiff here bases her claims under C.G.S. § 31-51q on the following speech:

1. Her complaint about a performance counseling meeting with her supervisors. (Compl. ¶ 30);

2. Her complaint that IKON employees did not take notes during candidate interviews. (Pl.'s Dep. p. 101);

3. Her complaint that IKON employees did not interview each candidate for the same amount of time. (Pl.'s Dep. p. 101-102);

4. Her complaint that Ms. LaFleur offered the job to a candidate – a black candidate - before interviewing all of the pre-screened applicants. (Pl.'s Dep. pp. 154-155);

5. Her complaint that an IKON client made what she identified as racially-motivated comments. (Compl. ¶¶ 22, 23);

6. Her complaint that an IKON client did not want to hire a black person. (Compl. ¶ 24);

7. Her complaint that Mr. Magel made comments about applicants' teeth, sex appeal, and health conditions. (Compl. ¶ 8, 9); and

8. Her complaint about Ms. LaFleur's behavior on one occasion. (Compl. ¶ 39).

None of these complaints can be characterized as relating to anything more than Plaintiff's personal employment situation about which she was expressing dissatisfaction. This speech cannot form the basis of a constitutionally cognizable claim.

In <u>Emerick v. Kuhn</u>, the plaintiff claimed his employer violated C.G.S. § 31-51q when it discharged him after he made complaints about some of the employer's management practices.   <u>Emerick v. Kuhn</u>, 52 Conn. App. at 740.   Specifically, the plaintiff raised concerns that while budget reductions and layoffs were forecasted, executives were being rewarded enormous bonuses without regard to the lower level employees or the fact that the company accepted financial aid from the state of Connecticut, and stated his opinion that the company was more concerned with short term profits rather than long term growth.  <u>Id</u>.  In affirming the trial court's decision to strike the § 31-51q claim, the Appellate Court confirmed that as a matter of law, the subject matter of the plaintiff's claim did not rise to the level of public concern necessary to form the basis of a constitutional claim.  <u>Id</u>. at 741.  The <u>Emerick</u> Court held that "[b]ecause the plaintiff's allegations concern the expression of his opinions as to perceived wrongdoing on the part of upper management . . . it is a matter between him and his employer and, thus, is not protected speech."  <u>Id</u>. at 744.   Internal complaints about managerial decisions, the <u>Emerick</u> Court held, are simply not matters of public concern.  <u>Id</u>.

On the same basis, the U.S. District Court in <u>Lowe v. Amerigas</u> granted the employer's motion for summary judgment on a C.G.S. § 31-51q claim brought by a former employee.  <u>Lowe v. Amerigas</u>, 52 F. Supp. 2d 349 (D. Conn. 1999) <u>aff'd</u>. 208 F. 3d 203 (2d Cir. 2000).  In that case, the plaintiff alleged he was terminated in retaliation for expressing his concerns about customer service, employee attitudes, employee racial remarks, and inventory control problems.  <u>Lowe</u> at 359.  The Lowe Court held that: "[P]laintiff's opinions on customer service, employee attitudes, racial remarks by other

employees, inventory control problems, and training clearly related to matters between plaintiff and Amerigas and were not matters of public concern" that could support a § 31-51q cause of action.  Id.  Similarly, the Court in <u>Urashka v. Griffin Hospital</u> granted the employer's motion to dismiss a former employee's § 31-51q claim on the basis that the plaintiff's speech related "solely to a private matter of the terms and conditions of her employment" that failed to suggest "any broader issue of public concern which would trigger the protection afforded by §31-51q."  <u>Urashka v. Griffin Hosp.</u>, 841 F.Supp. 2d 468 at 475 (D. Conn. 1994).

Similarly, in <u>Callaway v. Hafeman</u>, 832 F.2d 414 (7th Cir. 1987), an employee of a public school district alleged that she was fired because she complained to school district administrators that she was being sexually harassed.  The court acknowledged that "incidence of sexual harassment in a public school district are inherently matters of public concern," but held that "[w]hile the content of [the plaintiff's] communications touched upon an issue of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead, she spoke as an employee attempting to resolve her private dilemma." Id. at 417.

Plaintiff's complaints here were nothing more than expression of her dissatisfaction with her employment situation.  This speech is purely private in nature. Moreover, Plaintiff admits that the basis of her §31-51q claim is related only to IKON's hiring procedures and practices, not racism.  Specifically, Plaintiff identified the basis for her lawsuit this way:

      Q:    Is that the basis for your lawsuit?

A:      No.  [T]he basis for the lawsuit is that, in reporting a hiring practice that is
        not legal, I was retaliated upon, and in being retaliated, I suffered
        time out of work.  That's what it's about.

Q:      And you said that in reporting a hiring practice that was not legal.  What
        hiring practice is that that you claim you reported?

A:      Offering a position to a candidate before interviewing the other
        candidates.  (Pl.'s Dep. p. 192-193).

Q:      So your complaint with Kim LaFleur is that she offered the position to
        Mona Jackson on the spot without interviewing others, correct?

A:      Correct.  It's the hiring procedure, not racism, the hiring procedure.  (Pl.'s
        Dep. p. 161).

Whether IKON chose to interview one or twenty candidates for a job, or

chose to take notes during those interviews, or offered the job to the first or the last

candidate interviewed are not even arguably matters with inherent societal significance.

All of these matters are precisely the type of private matters that cannot form the basis of

a constitutionally cognizable claim. Plaintiff was not attempting to speak out as a citizen

concerned with problems facing the community at large when she complained about her

performance counseling meeting or Kimberly LaFleur's behavior; she was attempting

only to resolve her private workplace dilemma.  Similarly, Plaintiff's complaints about

remarks made by Tom Magel and by IKON's client, Trudy Muhlbauer, were merely

expressions of her opinion about appropriate behavior in the workplace. Despite

Plaintiff's use of the incendiary word "illegal" and "discriminatory" to describe the

subject matter of her speech, the speech itself was nothing more than comments related to

the terms and conditions of her private workplace situation.  In fact, Plaintiff

acknowledges that IKON hired a black candidate for the position.  (Pl.'s Dep. p. 154).

C.G.S. §31-51q should not be construed to transform every dispute about working

conditions into a constitutional question. See Cotto v. United Technologies Corp., 48 Conn. App. 618 (1998), aff'd. 251 Conn. 1 (1999). To sustain Plaintiff's §31-51q claim on the basis of this speech would entangle this Court in what amounts to nothing more than an employment dispute. For these reasons, Plaintiff's C.G.S. §31-51q claim is subject to summary dismissal.

B.    IKON Is Entitled to Summary Judgment on Count One of the Complaint Because Plaintiff Does Not Plead or Establish That Her Alleged Exercise of Free Speech Did Not Interfere With Her Job Performance Or Her Working Relationship With IKON

Plaintiff cannot prevail on her claimed violation of Conn. Gen. Stat. § 31-51q because she fails to properly plead this cause of action. Section 31-51q provides in relevant part:

> Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . [I]f the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.[14]

In order to demonstrate a violation of this statute, a plaintiff must allege: (1) an exercise of a right(s) protected by the first amendment of the United States Constitution or by an equivalent provision of the Connecticut Constitution; (2) an adverse

---

[14] Section 3 of Article First of the Connecticut Constitution provides for the protection of infringement of religious expression. Section 14 provides protection for assembly and petition. Plaintiff makes no allegations to support a cause of action under either of these provisions. The only provision of the Connecticut Constitution even arguably applicable here is Section 4, which provides that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects . . . ."

employment action on account of the exercise of this right(s); and (3) a demonstration that the exercise of this right(s) did not substantially or materially interfere with the plaintiff's bona fide job performance or with his/her working relationship with his/her employer. Lowe, 52 F. Supp. 2d at 359; Daley, 249 Conn. at 809 fn2 (same). The failure to plead each element of this statutory cause of action is fatal to a plaintiff's attempt to state a claim under it. Sierra v. State, No. CV000803588S, 2001 Conn. Super. LEXIS 1604, *14 (Conn. Super Ct. June 4, 2001).[15]

In Sierra, the Connecticut Superior Court granted defendant's motion to strike plaintiff's C.G.S. §31-51q claim on the basis that she inadequately pled the cause of action. The Sierra plaintiff had failed to assert the third element of §31-51q, namely, that her exercise of protected speech did not substantially or materially interfere with her job performance or with her working relationship with her employer. The court recognized and then dismissed Ms. Sierra's argument that failure to plead an element should be brought by the defendant as an affirmative defense, holding that the statute's language was clearly "consistent with the need to prove the matter as an element of the cause of action." Sierra at *13. The court struck the complaint for its variation from the "required pleading" to state a §31-51q cause of action. Sierra at *14; see also Sherman v. Sedgwick James of Connecticut, No. CV326150, 1997 Conn. Super. LEXIS 349, (Conn. Super. Ct. Feb. 10, 1997)[16] (granting defendant's motion to strike the plaintiff's C.G.S. §31-51q claim partly because the lack of interference with the working relationship was

---

[15] A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit A-5.

[16] A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit A-6.

not alleged).[17]    Federal courts that have construed this statute have reached the same

conclusion.  See Lowe v. Amerigas, 52 F.Supp. 2d at 349 (D. Conn. 1999) aff'd. 208 F.

3d 203 (2d Cir. 2000); see also Winik-Nystrup v. Manufacturers Life Ins. Co., 8 F. Supp.

2d 157, 159 (D. Conn. 1998) (stating the elements that a plaintiff is required to prove in a

§31-51q action are: (1) an exercise of a right(s) protected by the first amendment of the

United States Constitution or by an equivalent provision of the Connecticut Constitution;

(2) discipline or discharge on account of the exercise of this right(s); and (3) a

demonstration that the exercise of this right(s) did not substantially or materially interfere

with the plaintiff's bona fide job performance or with his/her working relationship with

his/her employer);   Williams v. Bayer Corp., 982 F. Supp. 120, 123 (D. Conn. 1997)

(same).

Like the Sierra plaintiff, Plaintiff here fails to allege that her claimed

exercise of protected speech did not interfere with her working relationship.   This

variation from the well-settled pleading requirements necessary to state a cause of action

under C.G.S. §31-51q renders Count One of Plaintiff's complaint legally deficient and

subject to dismissal.

C.    IKON Is Entitled to Summary Judgment On Count One Because Plaintiff
      Was Neither Disciplined Nor Discharged

Even if Plaintiff had alleged an appropriate § 31-51q cause of action based

upon speech that was constitutionally protected,  her claim must fail because IKON took

no adverse action against Plaintiff.   C.G.S. § 31-51q is an anti-retaliation statute; it

---

[17] There appears to be only one case – a Superior Court opinion – that held a plaintiff did not have to allege each element of the statute to state a claim under C.G.S. § 31-51q.  D'Alton v. Canterbury School, No. CV0054069, 1991 Conn. Super. LEXIS 1576 (Conn. Super. Ct. July 3, 1991).  In this brief opinion denying defendant's motion to strike plaintiff's C.G.S. § 31-51q claim, Judge Pickett does not articulate the basis for his departure from established precedent.  A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit 7.

prohibits an employer from subjecting any employee to "discipline or discharge" on account of the exercise of constitutionally protected rights. Plaintiff does not and cannot allege that IKON terminated her employment on account of the exercise of a constitutionally protected right. To the contrary, Plaintiff acknowledged in her deposition that she "wasn't terminated."[18] (Pl.'s Dep. p. 142). Therefore, to state a legally viable § 31-51q claim, Plaintiff must demonstrate IKON took some disciplinary measure against her as a result of her alleged exercise of constitutionally protected rights. She does not do so.

The adverse employment action element of C.G.S. § 31-51q is analogous to the identical requirement necessary to state an employment discrimination cause of action under CFEPA or Title VII of the Civil Rights Act of 1964. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. New York City Board of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted; internal quotations omitted). "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (citation omitted; internal quotations omitted). See also Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996) ("Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims"); Darnell v. Campbell Country Fiscal Court, 731 F. Supp. 1309, 1313 (E.D. Ky 1990), aff'd, 924

---

[18] On June 11, 2003, Plaintiff stopped reporting to work because, she testified, her lawyer "told (her) not to report to work for a few days." (Pl.'s Dep. p. 142). Plaintiff acknowledged that "[H]R from IKON told me I could have very much so kept going to work. I didn't have to listen to my attorney. He was giving me ill counsel." (Pl.'s Dep. p. 142) In response to the question: "Is the only reason you did not return to work at IKON from March 7th, 2003 until today based on conversations with your attorney?" Plaintiff responded: "Yes." (Pl.'s Dep. pp. 144-145).

F.2d 1057 (6th Cir. 1991) ("[A] transfer at no loss of title, pay or benefits does not amount to a constructive discharge or adverse employment action.").

An adverse employment action is an action taken by the employer that "constitutes a significant change in [the employee's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Broughton v. Connecticut Student Loan Foundation, 64 F. Supp. 2d 64, 68 (D. Conn. 1999) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, (1998)). "A tangible employment action in most cases inflicts direct economic harm." Burlington, 524 U.S. at 762. A transfer that involves no loss of rank or base pay does not constitute "discipline" within the meaning of C.G.S. § 31-51q. D'Angelo v. McGoldrick, No. CV9360063904S, 1995 Conn. Super. LEXIS 2305, *13 (Conn. Super. Ct. Aug. 3, 1995) aff'd. 239 Conn. 356 (1996).[19]

In D'Angelo v. McGoldrick, two police officers alleged they were transferred to a new assignment in retaliation for their exercise of constitutionally protected rights in violation of C.G.S. § 31-51q. In rendering a verdict for the defendants, the D'Angelo court held that the transfer, which involved no loss of pay or rank, did not constitute "discipline" that could form the basis of a § 31-51q claim. Id. at * 13.

Plaintiff's claims here are virtually identical to those set forth by the D'Angelo plaintiffs. Plaintiff claims that after she complained about her supervisor, IKON transferred her to a new supervisor in the Stamford office. (Compl. ¶ 41). It is undisputed that the Stamford office was within Plaintiff's territory and that she worked in the Stamford area. (Exhibit B ¶ 4). Plaintiff also worked in that office on a number of

---

[19] A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit 8.

occasions when her home office was located in Milford. (Compl. ¶ 27). It is also undisputed that this transfer involved no loss of pay and no change in position, title or benefits. Moreover, Plaintiff testified on a number of occasions that she was "happy" and "excited" that she was transferred to a new supervisor. (Pl.'s Dep. p. 130-131) ("[S]o, as a team, we were trying to correct things, and I thought that it was going to happen. They changed my report, they changed my location, they removed Kim Fordham because she was found guilty of hearing information and not doing anything about procedures and they moved in Joe Manglass. So I was excited that change was happening within IKON. . . . [S]o they removed [Kim Fordham] and put in Joe Manglass, which I was very happy with."). In addition, IKON offered Plaintiff this change in worksite in an effort to accommodate her and to address her stated concerns about reporting to the Milford office. (Exhibit F-5). Indeed, Plaintiff was informed in writing that if she "[w]ould like to continue to report to the Milford location, this too can be arranged." (Exhibit B-5).

An offer to transfer Plaintiff to an alternative worksite with the same pay, position, title, and benefits is not "discipline" within the meaning of C.G.S. § 31-51q. Plaintiff's other allegations of "discipline" are similarly misguided. Plaintiff claims that on one occasion she was asked to perform training at a different location in her territory (Compl. ¶ 27); that a co-worker regularly walked by her open classroom door (Compl. ¶ 28); that a co-worker lodged a sexual harassment complaint against her (Compl. ¶ 34); and that her supervisors met with her to discuss complaints a number of her co-workers had lodged about her (Comp. ¶ 30).[20] It is undisputed that, even if true, none of these

---

[20] At her deposition, Plaintiff asserted that her attendance at a week-long training session for which she had to commute to New York City was also an act of retaliation by IKON. (Pl.'s Dep. p. 141, 288). Plaintiff's allegation post-dates her complaint. Moreover, Plaintiff's attendance at that training session was at her request, and IKON offered to pay for a hotel room in the city for her. (Exhibit H ¶¶ 6, 8).

actions involved any loss of pay, demotion, or disciplinary warning. Plaintiff's supervisors did not issue her a written warning as a result of their meeting with her. Plaintiff testified that at the close of the meeting with her supervisors they stated that the meeting was "[s]omething that shouldn't have happened and apologized. They both apologized." (Pl.'s Dep. p. 123).

In sum, Plaintiff has not alleged one action by IKON that could even arguably constitute "discipline" within the meaning of C.G.S. § 31-51q. Without any demonstration of retaliation by the employer, C.G.S. § 31-51q is inapplicable on its face. Plaintiff's statutory claim is subject to summary dismissal on this basis alone.

D.    Even If Plaintiff's Speech Relates To Matters of Inherent Public Concern, IKON Is Entitled To Summary Judgment On Count One Because Plaintiff's Claims Fall Within the Exclusive Jurisdiction of the Connecticut Fair Employment Practices Act

To the extent any of Plaintiff's speech can be interpreted to constitute claims of sexual harassment or race or disability discrimination in the workplace, her claims of retaliation for making those complaints falls within the primary and exclusive jurisdiction of the Connecticut Fair Employment Practices Act, 46a-58 *et seq*. Plaintiff has failed to exhaust the requisite administrative remedies necessary to file these claims. Her failure to do so deprives this Court of jurisdiction over this case.

C.G.S. § 46a-60(a)(4) provides that it shall be illegal for any person or employer to discriminate against any persons "[b]ecause such person has opposed any discriminatory employment practice or because such person has filed a complaint . . . ."; § 46a-60(a)(1) prohibits discrimination on the basis of, *inter alia*, mental or physical disability; § 46a-60(a)(5) provides that it is illegal to "[a]id, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice . . . ."; and

28

§46a-60(a)(8) prohibits harassment on the basis of sex. In addition to other laws describing other protected categories, these statutes comprise the Connecticut Fair Employment Practices Act, 46a-58 *et seq*.

When a claim is made with respect to a protected category under the Connecticut Fair Employment Practices Act, the exclusive remedy is in the procedures established by the act. <u>Sullivan v. Board of Police Commissioners</u>, 196 Conn. 208, 216 (1985); <u>Atkins v. Bridgeport Hydraulic Co.</u>, 5 Conn. App. 643, 647 (1985). The process for filing a complaint based on a discriminatory employment practice is clearly outlined in C.G.S. § 46a-83(a), which provides:

> After the filing of any discriminatory practice complaint, the chairman of the Commission (on Human Rights and Opportunities or CHRO) shall refer the same to a commissioner or investigator to investigate and if the commissioner or investigator determines after the investigation that there is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint, he shall endeavor to eliminate the practice complained of by conference, conciliation and persuasion.

If these procedures are unsuccessful, the CHRO must then certify the complaint, hold a hearing and order relief if appropriate. C.G.S. §§ 46a-84 and 86. Only after the matter has been processed in accordance with this statutorily-mandated process and a plaintiff has obtained a release from the CHRO may he or she file an action in court. C.G.S. § 46a-100.

The CHRO is charged by the CFEPA with "initial responsibility for the investigation and adjudication of claims of employment discrimination. That the act does not provide an unconditional private right of action for claimants . . . is underscored by the terms of General Statutes § 46a-99, which expressly provides such a direct right of

action when the allegedly discriminatory employer is a state agency." Sullivan, 196

Conn. 208 at 216.  Accordingly, plaintiffs must exhaust the administrative remedies

outlined in the CFEPA before filing an employment discrimination claim in court.  Not

doing so deprives the court of subject matter jurisdiction over plaintiff's claim and

subjects it to immediate dismissal.  Catalano v. Bedford Assoc., Inc., 9 F. Supp. 2d 133,

135 (D. Conn. 1998) (holding that subject matter jurisdiction does not exist where a

plaintiff has not obtained a release from the CHRO and has, therefore, failed to comply

with the clear and unambiguous statutory prerequisite embodied in C.G.S. § 46a-101).

See also White v. Martin, 23 F. Supp. 2d 203 (D. Conn. 1998) (dismissing plaintiff's

Title VII and state law employment discrimination claims because his failure to exhaust

administrative remedies claims deprived the court of jurisdiction); Simko v. Ervin, 234

Conn. 498, 503 (1995) (holding that the exhaustion doctrine reflects the legislative intent

that such issues be handled initially by local administrative agencies).

It is undisputed that the Plaintiff here did not obtain a release from the

CHRO prior to instituting the instant litigation.  The fact that Plaintiff has filed

complaints against IKON at both the CHRO and the EEOC makes it readily apparent that

she is aware of the availability of administrative remedies for her claims.  It is undisputed

that investigations in both forums are currently pending.  Plaintiff's failure to exhaust the

remedies available to her there deprives this Court of jurisdiction over this complaint,

which warrants dismissal on this basis alone.

     E.     IKON is Entitled To Costs And Attorney's Fees Because Plaintiff Brought
a Claim Under C.G.S. § 31-51q Without Substantial Justification

C.G.S. § 31-51q provides that if a court determines that an action for

damages was brought under the statute "without substantial justification," the court may

award costs and attorney's fees to the employer. Plaintiff's claim here falls into this category. Plaintiff fails to allege the elements necessary to make out a claim under § 31-51q. She does not base her claim on the exercise of protected rights. To the extent that she does file the claim on a proper basis, she attempts to do so on bases that fall within the exclusive jurisdiction of the CFEPA, and fails to exhaust the administrative remedies requisite to bringing these claims. Plaintiff also fails to identify any adverse employment action. Plaintiff's C.G.S. § 31-51q claim is substantively without merit, and is frivolous on its face. Plaintiff's utter failure to institute this action with any justification, much less the "substantial justification" required by C.G.S. § 31-51q, entitles IKON to costs and fees in accordance with its provisions.

F.    IKON Is Entitled To Summary Judgment On Count Two Because The Alleged Conduct Was Not Extreme And Outrageous

Plaintiff cannot prevail on her intentional infliction of emotional distress claim because she does not allege unreasonable, much less extreme and outrageous, conduct. To state a meritorious claim of intentional infliction of emotional distress under Connecticut law, a plaintiff must demonstrate: (1) that the defendant intended to inflict emotional distress; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was in fact the cause of the plaintiff's distress; and (4) that the distress sustained by Plaintiff was severe. Petyan v. Ellis, 200 Conn. 243, 253 (1986). Conduct is deemed extreme and outrageous where it "exceeds all bounds usually tolerated by a decent society." Appleton v. Board of Educ. of Stonington, 254 Conn. 205, 210 (2000). "The 'extreme and outrageous' standard is a high one: liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious

31

and utterly intolerable in a civilized community." See Reed v. Town of Branford, 949 F.
Supp. 87, 92 (D. Conn. 1996) (quoting Restatement (Second) of Torts §46, comment d
(1965)). Whether a defendant's conduct rises to the level of extreme and outrageous is
initially a question for the Court. Appleton, 254 Conn. at 211.

Here, Plaintiff has presented allegations in support of her emotional
distress claim that IKON:

(1)    met with her to allow her to express concern about the candidate selection
        process, and then told her to continue to do her job (Compl. ¶ 26);

(2)    requested that she perform training in a location within her territory even
        though Plaintiff did not feel the proper training equipment was in place at
        that location (Compl. ¶ 27);

(3)    walked by the open door when she was performing training (Compl. ¶ 28);

(4)    met with her to discuss complaints co-workers had lodged against her
        (Compl. ¶ 30);

(5)    agreed that a performance warning was unjustified, did not issue her a
        performance warning, and apologized for proposing the warning (Compl.
        ¶ 32; Pl.'s Dep., ¶ 123);

(6)    met with her to discuss her complaints about co-workers and co-workers'
        complaints about her (Compl. ¶ 39); and

(7)    provided her with a new supervisor in a new location that was within her
        territory (Compl. ¶ 41).

Even assuming all of these allegations are true, they are insufficient to
create a genuine issue of material fact as to whether IKON's conduct was extreme and
outrageous.

Connecticut courts have defined the boundaries of "extreme and
outrageous conduct" very narrowly. Actions that may be distressing to a plaintiff have
been deemed to fall outside those parameters. See Hood v. Aerotek Inc., No.

3:98CV1524, 2002 U.S. Dist. LEXIS 3513, \*18-\*21 (D. Conn. Feb. 20, 2002)[21]
(allegations that a supervisor lied to the plaintiff about the length of time the employer
would use her services for his personal benefit, including the commission he would
receive if she took the job, did not amount to "extreme and outrageous conduct"); see
also Appleton, 254 Conn. 205 (allegations that defendants' condescending comments to
the plaintiff in front of her colleagues about her vision and ability to read; telephoning
plaintiff's daughter, representing that the plaintiff "had been acting differently" and
should take a few days off from work; and telephoning the police, who came to the
school and escorted plaintiff out of the building, did not rise to the level of "extreme or
outrageous conduct"); Rock v. Mott Metallurgical Corp., No. CV990492215S, 2001
Conn. Super. LEXIS 207, \*16-\*19 (Conn. Super. Ct. Jan. 10, 2001)[22] (allegations that the
plaintiff's supervisor called her stupid and lame-brained and referred to her as an idiot;
where she was made the subject of ridicule by being used as an example of a poor
employee on a daily basis; was falsely accused of not completing her assigned tasks and
screamed at by her supervisor; and told by a co-worker to "fu\*\* herself" did not rise to
the level of "extreme and outrageous conduct").

      Actions that are unlawful also have been deemed outside the parameters of
the requisite extreme and outrageous conduct. In DeLeon v. Little, 981 F. Supp. 728,
737-739 (D. Conn. 1997), for example, this Court found that the employer's conduct was
not extreme or outrageous where a supervisor requested that the plaintiff purchase drugs
and stand guard while the supervisor ingested drugs; required the plaintiff to perform
personal errands; called plaintiff at home; repeatedly degraded and criticized the plaintiff

---

[21] A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit A-9.
[22] A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit A-10.

in front of other co-workers; and threatened to terminate plaintiff. Similarly, in <u>Aquavia</u> <u>v. Goggin</u>, 208 F. Supp. 2d 225, 237-38 (D. Conn. 2002), this Court granted judgment to the employer on plaintiff's intentional infliction of emotional distress claim, which was based upon the employer's issuance of a disciplinary warning in retaliation for plaintiff's alleged exercise of free speech. The <u>Aquavia</u> Court held that while the disciplinary warning may have been unlawful and may be a predicate for a First Amendment retaliation claim, it was not, of itself, an extreme and outrageous act.

To state a claim sounding in intentional infliction of emotional distress, it is the act itself, not the motivation for the act, which must be outrageous. <u>See Aquavia</u> at 237; <u>see also</u> <u>Huff v. West Haven Board of Educ.</u>, 10 F. Supp. 2d 117, 123 (D. Conn. 1998) (holding that an employer's act, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior); <u>Emanuele v. Baccaccio & Susanin</u>, No. CV900379667S, 1994 Conn. Super. LEXIS 3156, *6-*7 (Conn. Super. Ct. Dec. 1, 1994)[23] (allegations that an employer made false statements about plaintiff's work performance and used threats and intimidation to force her to sign a document against her will for the purpose of depriving her of benefits and compensation did not constitute "extreme and outrageous conduct.")

None of the actions Plaintiff identifies to support her emotional distress claim constitute the "extreme and outrageous conduct" requisite to a viable intentional infliction of emotional distress claim. Plaintiff alleges that IKON representatives met with her on three occasions. (Compl. ¶¶ 26, 30, 39). Plaintiff does not allege that any IKON employee used foul language, raised his or her voice, or otherwise engaged in behavior that could be dubbed "extreme" or "outrageous" during these encounters. In

---

[23] A true and correct copy of this decision is attached to the Strange Affidavit as Exhibit A-11.

fact, Plaintiff testified that at the close of one meeting, her supervisors told her the meeting "shouldn't have happened and apologized. They both apologized." (Pl.'s Dep. p. 123). It is undisputed that the purpose of these meetings was to investigate and resolve internal complaints. In accordance with its responsibility as an employer, IKON investigated all of Plaintiff's claims and all of Plaintiff's co-workers complaints about her, and provided Plaintiff with a summary and written resolution of these investigations. (Exhibit 10). It is undisputed that no disciplinary warning or other adverse employment action resulted from these meetings. These acts not only do not constitute extreme and outrageous conduct, they are reasonable and in fact *beneficial* to Plaintiff. Attempting to state an emotional distress claim on the basis of these acts is frivolous and insincere, and the claim warrants dismissal as a matter of law.

Plaintiff's attempt to base her emotional distress claim on the undisputed facts that she was asked to change a training site and that a co-worker walked by the doorway when she was conducting training is similarly misguided. Neither of these actions constitute extreme and outrageous conduct. Plaintiff's claim that she was transferred to work out of a different location within her territory is an equally frivolous basis upon which to base this claim. As discussed above, IKON offered Plaintiff this change in worksite to accommodate her. (Exhibit B-8). At the same time it offered this transfer, IKON offered Plaintiff the option of continuing to report to the Milford worksite. (Exhibit B-8). Moreover, even if, as Plaintiff alleges, this change in worksite was in retaliation for her alleged exercise of protected speech, the motivation behind the act is not a relevant inquiry in determining whether the act itself is extreme and outrageous. As discussed above, it is the act itself, not the motivation for the act, which

35

must be outrageous. <u>Aquavia</u>, 208 F. Supp. 2d at 237-38; <u>Huff</u>, 10 F.Supp. 2d at 123. Clearly, none of the acts in which Plaintiff alleges IKON engaged rise, as a matter of law, to the level of extreme and outrageous conduct under well-established precedent. Accordingly, IKON is entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress set forth in Count Two.

VI.    <u>CONCLUSION</u>

Based on the foregoing, IKON Office Solutions, Inc. respectfully requests that this Court grant summary judgment on Counts One and Two of Plaintiff Carol Connelly's complaint, and requests the award of costs and attorneys' fees for Plaintiff's institution of this action without substantial justification.

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.,

By:    *Margaret J. Strange*

Margaret J. Strange (ct 08212)
strangem@jacksonlewis.com
Holly L. Cini (ct 16388)
cinih@jacksonlewis.com
Jackson Lewis LLP
55 Farmington Avenue
Suite 1200
Hartford, CT  06105
Ph: (860) 522-0404
Fax: (860) 247-1330

<u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing was sent by first class mail,

postage prepaid, on this 8th day of April, 2004 to the following counsel of record:

Cynthia R. Jennings, Esq.
The Barrister Law Group, LLC
211 State Street
Bridgeport, CT 06604


*Margaret J. Strange*
Margaret J. Strange