```
                FILED

            2004 APR 27  P 3: 44

            U.S. DISTRICT COURT
            BRIDGEPORT, CONN
```

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAROL CONNELLY | : | |
| *Plaintiff* | : | CIVIL NO.: 3:03CV0551(JCH) |
| | : | |
| v. | : | |
| | : | |
| IKON OFFICE SOLUTIONS, INC. | : | **Amended:** |
| *Defendant* | : | April 27, 2004 |

## COMPLAINT

### I. JURISDICTION:

1.  This is an action for the deprivation of First Amendment Rights in violation of Conn. Gen. Stat. § 31-51q and the First Amendment of the United States Constitution.

2   This is an action for the Intentional Infliction of Emotional Distress. Jurisdiction of this action is found pursuant to the Court's supplementary jurisdiction over state actions. Jurisdiction of this court is also invoked under the provisions of 28 U.S.C. § 1332, diversity of citizenship.

### II. PARTIES

3.  During all times mentioned in this action, the plaintiff was, and still is, an adult citizen of the United States residing in the State of Connecticut.

1

4.      On or about November 18, 2002, plaintiff began her employment with defendant as a Corporate Recruiter/Trainer for the Northeast Region, Connecticut Market Place.

5.      In her capacity as recruiter/Trainer, plaintiff assisted in the placement of part-time and full-time employees with Connecticut businesses and taught Outsource Basic Training ("OBT") classes.

6.      In or around December 2002, plaintiff began participating in several interviews with possible candidates for the placement of a receptionist position at the law firm of Wiggin & Dana.

7.      Plaintiff conducted all of these interviews with an IKON Senior Integrated Account Manager, Ms. Kimberly LaFleur, who was the designated liaison between Wiggin & Dana and the IKON staffing service.

8.      On December 30, 2002, plaintiff and Ms. LaFleur co-interviewed Mona Jackson, a [dark skinned] African American, for the receptionist position at Wiggin & Dana.  During this meeting, Ms. LaFleur told plaintiff that Wiggin & Dana was not interested in hiring any Black candidates.  Plaintiff told Ms. LaFleur that such conduct was discriminatory and illegal, and that she would not participate in such behavior.

9.      On January 2, 2003, plaintiff and Tom Magel, the Milford Director of Operations, co-interviewed Karol Somers, a Caucasian.  Mr. Magel ended the

2

Cynthia R. Jennings, Esq., (ct21797)
The Barrister Law Group, LLC
211 State Street, Bridgeport, CT
(203)334-4800, Fax (203) 368-6985
Email: Cynthia.Jennings@sbcglobal.net

interview in an unusually short period of time. When plaintiff objected to what appeared to be a snap-judgment, Mr. Magel stated that Ms. Somers "need[ed] too much dental work."

10. Also on January 2, 2003, plaintiff and Mr. Magel co-interviewed Megan Reily, a Caucasian. Ms. Reily had offered the information that she had a pre-existing heart condition. This condition required her to see her physician monthly. Mr. Magel stated that Ms. Reily was "sexy, just what lawyers like to look at," but that he did not want to hire her because of her heart condition.

11. The defendant, IKON Office Solutions, Inc., is a copying and office services company with offices in the state of Connecticut.

### III. STATEMENT OF CLAIMS

<u>**COUNT ONE:**</u>
**Deprivation of First Amendment Rights in Violation of Conn. Gen. Statutes § 31-51q**

12. On January 3, 2003, plaintiff went to Kim Fordham, the Area Recruiting manager, and expressed concerns that receptionist candidates for the position at Wiggin & Dana were not being assessed on the basis of their qualifications. Ms. Fordham appeared unconcerned and asked plaintiff to continue sourcing for the position.

3

13. On January 9, 2003, plaintiff and Ms. LaFleur were assigned to a training day together. Ms. LaFleur was to introduce plaintiff to some of her accounts.

14. On route to the various account sites, Ms. LaFleur chose to talk about personal stories instead of work, including details regarding her illness related to her cancer surgery and the fact that she was a lesbian. Plaintiff attempted to steer the conversation back to work, but to no avail.

15. After leaving a particular site, Ms. Lafleur began to talk about the previous relationship with a college professor and how she had thrown a scuba tank through her windshield when they had broken up. Plaintiff began to feel very uncomfortable and again tried to steer the conversation back to work. Then, unannounced, Ms. LaFleur took Plaintiff to her home and asked her to come in and meet her partner. Plaintiff refused and asked Ms. LaFleur to take her back to the office.

16. On the way back, Ms. LaFleur asked plaintiff if she would like to "fool around" with her and her partner. At this point plaintiff was furious and sternly told Ms. LaFleur that she had over stepped her bounds. Ms. LaFleur asked plaintiff not to say anything about the incident to her supervisor.

17. In and around this time, Ms. Trudy Muhibauer, the Human Resource Director for Wiggin & Dana, insisted that she conduct the interviews with Ms. La Fleur for the receptionist position. Previously, Ms. LaFleur has been mainly

4

responsible for hiring candidates. Ms. Muhibauer expressed concerns that Ms. LaFleur was not selecting the correct people to interview and wanted to have the final say in the selection process.

18. On January 9, 2003, plaintiff, Ms. LaFleur and Ms. Muhibauer co-interviewed Tina Glover, an African American, and Nicole Smith, a Caucasian. After these interviews, Ms. Muhibauer expressed dissatisfaction with the candidates, stating that plaintiff and Ms. LaFleur were bringing her candidates "from a background that doesn't want to work hard."

19. Ms. LaFleur and plaintiff suggested that Ms. Muhibauer might want to consider an IKON employee, Maribell Quinnones, a woman of Hispanic descent, who was currently working for Wiggin & Dana as a hostess. This employee had expressed interest in the position and had the appropriate background experience for the job.

20. Ms. Muhibauer stated that she was not acceptable because of her "energy level" and "accent." Furthermore, Ms. Muhibauer stated, "people from that neighborhood can't change and won't change." When plaintiff challenged Ms. Muhibauer on this assessment, Ms. Muhibauer said, "those people can't change, they just don't want to work. I only finished High School and worked my way up without a college degree. Those type of people are useless."

5

21. On January 15, 2003, Ms. Muhibauer and Ms. LaFleur, co-interviewed two candidates, Mona Jackson a [dark skinned] African American, and Tina Glover a [light skinned] African American. Ms. Muhibauer conducted very short, curt, interviews with the two candidates, asking very few questions. Ms Muhibauer expressed no interest in hiring either candidate.

22. Later that day, Ms LaFleur wrote an email to Ms. Fordham stating that plaintiff had an "outstanding job sourcing for a person to fill [the] position in Stamford. However, much to [her] dismay, the customer wants to continue sourcing for the 'right' person." Ms. LaFleur repeated that the situation bore "no reflection on Carol's efforts" but that, "the customer is looking for that perfect person."

23. In and around that time, Ms. Muhibauer was scheduled to interview another candidatr, Annisa Maples, another [light skinned] African American, at Wiggin & Dana. While Ms. Maples was in the waithing room Ms. Muhibauer went out looked at her and stated: "I do not have time to see you today." When confronted about this appointment, Ms. Muhibauer falsely claimed that the interview had not been set up.

24. On January 16, 2003, Ms. LaFleur confided in plaintiff that Ms. Muhibauer had made numerous discriminatory statements regarding the candidates during the January 15, 2003, interviews. Ms. LaFleur told plaintiff that after the interviews, outside plaintiff's presence, Ms. Muhibauer stated that she did "not want

6

another girl from the 'hood' on the front desk, wearing those muffin hats and pronouncing the firm as Wigga & Danna."

25.  Specifically, Ms. Muhlbauer stated that Ms. Jackson was "too black." She also said she had the same problem with Ms. Glover – even though she was not "technically black, she was too black to be hired." Ms. Muhlbauer also stated that she would accept a "white person" either "male or female."

26.  Ms. LaFleur also confided in plaintiff that she wanted to tell Ms. Muhlbauer that she was afraid she would lose the account.

27.  On January 17, 2003, plaintiff again went to her immediate supervisor, Ms. Fordham, and complained that she was being asked to be involved in a process which discriminated against candidates. Ms. Fordham, again, seemed uninterested and told plaintiff to continue sourcing for the job.

28.  On or around January 20, 2003, Ms. LaFleur unaccountably asked plaintiff to switch her OBT training location from Stamford to Milford. Plaintiff was not informed why Ms. LaFleur wanted her to change locations. To the contrary, plaintiff told Ms. LaFleur that there was not proper equipment to train in Milford and that it was an inappropriate move.

29.  When plaintiff began teaching in Milford, Ms. LaFleur started to regularly walk by the open classroom door. As it turns out, Ms. LaFleur was attempting to gather information to carry back to plaintiff's supervisor. This action on the part of

7

Ms. LaFleur was taken in order to harass plaintiff and to retaliate against plaintiff for previously opposing discriminatory conduct.

30. On January 22, 2003, Ms. LaFleur wrote plaintiff an email stating that she had called Spherion, another outsourcing operation in Connecticut, in order to find more candidates for the receptionist position at Wiggin & Dana. In or around this time Ms. LaFleur informed plaintiff that she would no longer be working on hiring the receptionist position. Her removal from this hiring project was in retaliation for plaintiff's previous opposition to discriminatory conduct.

31. On January 23, 2003, plaintiff was called into a meeting with Ms. LaFleur and Rich Silva, Director of Recruiting and Training. During this meeting, which lasted three (3) hours long, Ms. LaFleur and Mr. Silva made numerous false allegations and threatened to give plaintiff a written warning, which was a preliminary to being fired.

32. Many of the above allegations were personal attacks, including statements that plaintiff taught her training classes in a "militant" manner; that she couldn't retain information; that she called Ms. LaFleur six times a day with the same question; and, that plaintiff did not 'fit' into the IKON 'culture' because she was too task and deadline oriented.

33. During this interrogation, Mr. Silva demanded that plaintiff read her warning and sign it in front of him. Plaintiff requested that she be permitted to read

8

the warning alone. After reading the warning, plaintiff refuted each one of the points individually. At the end of the meeting Mr. Silva agreed with plaintiff that the warning was unjustified and tore it up.

34. This unjustified and unprecedented interrogation was clearly aimed at inflicting emotional distress upon the plaintiff in order to retaliate against her for her prior complaints of discrimination and in order to get her to quit.

35. On January 24, 2003, Ms. LaFleur, in a blatant attempt to retaliate against plaintiff for having made complaints of racial discrimination, sent a bogus complaint of sexual harassment against plaintiff to Sarah Allen, IKON Human Resources Manager.

36. On January 25, 2003, plaintiff sent an email to Ms. LaFleur detailing the discriminatory comments made by Ms. Muhibauer on January 15, 2003, and complaining about further discriminatory conduct. Plaintiff carbon copied Kim Fordham, Richard Silva, Tom Magel and Sarah Allan on this email.

37. On January 24, 2003, plaintiff, with a note from her physician, took an unpaid leave of absence due to the acute emotional distress caused by the above-described retaliatory conduct, the purpose of which was to inflict severe emotional distress and force her to resign.

38. On January 31, 2003, while plaintiff was on leave by recommendation from her physician, plaintiff received a letter from Sarah Allen informing her of Ms.

9

LaFleur's bogus allegation of sexual harassment. This personal attack compounded plaintiff's severe emotional distress.

39. On February 26, 2003, plaintiff met with Mai White, the Regional Human Resources Director, whom she had sought out in order to escalate her reports of retaliation and discrimination to a higher level. In that meeting plaintiff detailed the defendant's harassing and retaliatory behavior against her.

40. In retaliation for making complaints of racial discrimination, Ms. White ignored plaintiff's complaints and instead spent a significant portion of the interview detailing Ms. LaFleur's bogus claims of sexual harassment. Plaintiff denied all of Ms. LaFleur's allegations and told Ms. White about the January 9, 2003, incident with Ms. LaFleur.

41. On March 7, 2003, Ms. White sent a letter to Plaintiff, confirming the obvious, that there was "insufficient evidence" to support Ms. LaFleur's bogus claims of sexual harassment. However, in an obvious effort to undermine plaintiff's credibility, Ms. White cited an equally bogus "investigation" which uncovered "no evidence to support [plaintiff's] allegation" of discriminatory hiring practices or of retaliation.

42. Furthermore, Ms. White stated that upon her return to work, plaintiff would be reassigned to a new manager, Joe Manglass, Area Recruiting Manager for

10

New York City, and would be relocated to a new home base in Stamford. This was done over plaintiff's complaints that such actions were punishing the victim.

42. The Stamford office is a two-hour (2) commute from plaintiff's home in Groton. Plaintiff's assignment to his office, which is double the commute from her previous office in Milford, was in retaliation for her complaints of discrimination and an attempt to get her to resign her position.

44. On March 11, 2003, plaintiff received an email from defendant demanding she return to work on March 12, 2003, in Stamford.

45. Notwithstanding the severe emotional disturbance she was suffering from on account of defendant's retaliation, plaintiff returned to work on March 12, 2003, only to find that the supervisor to whom she had been assigned was absent. This forced her to commute two hours to an office with no supervisor. Furthermore, there were no accommodations made for plaintiff at the Stamford LDS location. The LDS manager, Davis Portalatain, told plaintiff that she was only going to be at the Stamford location for two months.

46. Also on March 12, 2003, plaintiff worked with a Recruiter/Trainer from New York City. She informed plaintiff that she was going to be moving to the Stamford area in two months and that she was offered the Connecticut territory. Plaintiff was shocked to hear this information because she was currently assigned to the Connecticut marketplace. This was another blatant effort on the part of the

11

Defendant to retaliate against plaintiff for having opposed discrimination and an attempt to humiliate and frustrate her into quitting her position.

47. In March 31, 2003, plaintiff was asked to attend an Outsource Basic Training ("OBT") in New York City. The travel is two and half hours from Groton to Stamford, and then she would take the train to Manhattan, another hours worth of traveling which plaintiff is not paid for travel miles.

48. On Monday, March 31, 2003 and Tuesday April 1, 2003, plaintiff had discussed with defendant that she had previously taken the OBT test receiving a grade of 100% on all parts.

49. Diana Diaconescu devised a plan for plaintiff while the OBT class was testing. Plaintiff would spend time on the production floor and observe a shift manager. Plaintiff was told the times that she needed to report to the production floor. Ms. Diaconescu stated that plaintiff would not be taking the OBT tests, since she already earned a 100% on all four parts. The only reason that the plaintiff was re-taking OBT was to spend time on the production floor.

50. On or about April 1, 2003, plaintiff e-mailed Sarah Allen, explaining that the travel needed to be reassessed. Plaintiff pointed out that she had been traveling for three days spending six hours per day commuting to New York. In said e-mail, plaintiff explained to Ms. Allen that it was unreasonable for defendant to ask her to spend so much time commuting.

Cynthia R. Jennings, Esq., (ct21797)
The Barrister Law Group, LLC
211 State Street, Bridgeport, CT
(203)334-4800, Fax (203) 368-6985
Email: Cynthia.Jennings@sbcglobal.net

51. On or about April 1, 2003, Ms. Allen told plaintiff that she had discussed this matter with Rich Silva and that defendant proposed two options. One would be for her to take the train from New Haven and second, that defendant would get a hotel for plaintiff in New York City.

52. On April 2, 2003, plaintiff arrived in NYC and was greeted by Ms. Diaconescu. Ms. Diaconescu informed plaintiff that she had changed the plan and that plaintiff needed to take the tests. Plaintiff told Ms. Diaconescu that she was not aware that she needed to take the test, therefore she did not study.

53. Plaintiff requested that she be given some time to at least look over the materials and was told by defendant that was not necessary. Ms. Diaconescu said that she had been called by Mr. Manglass requesting that plaintiff be tested even thought she had not studied.

54. Plaintiff did not have a problem retaking the test, however plaintiff was not given forewarning and the equal preparation time that other students were given. Based on defendant's retaliatory actions and ongoing harassment, plaintiff was stressed and scheduled an appointment to see Dr. Ramirez.

55. Based on the foregoing, plaintiff has been disciplined, harassed, intimidated, threatened, and otherwise subjected to discrimination in the terms and conditions of her employment in retaliation for having exercised her rights under the First Amendment of the U.S. Constitution and Sections 4 and 14 of the Connecticut

13

State Constitution in opposing discriminatory treatment, including her right to free speech on matters of public concern. Said conduct is a direct violation of Section 31-51q of the Connecticut General Statutes, which protects an employees' rights as indicated under the Federal and State Constitutions.

## COUNT TWO:
### Intentional Infliction of Emotional Distress

56.   Paragraphs 1 through 55, inclusive, of Count One, are hereby made paragraphs 56 of Count Five as if fully set forth herein.

57.   Based on the foregoing, plaintiff was intentionally harassed, intimidated, and threatened in retaliation for having opposed defendant's discriminatory conduct. Such acts by defendant were done in a persistent and escalating intentional effort to punish plaintiff and retaliate against her and were extreme, outrageous and exceeds all bounds tolerated by decent society.

58.   The aforesaid actions and omissions on the part of defendant were with malice and were intentional in that they were willful, wanton, and/or were taken in reckless disregard of plaintiff's rights.

59.   As a direct and proximate result of the aforesaid acts, plaintiff suffered damages, including loss of income and benefits mental anguish, severe emotional distress, humiliation, embarrassment and damage to her personal and professional reputation.

Cynthia R. Jennings, Esq., (ct21797)
The Barrister Law Group, LLC
211 State Street, Bridgeport, CT
(203)334-4800, Fax (203) 368-6985
Email: Cynthia.Jennings@sbcglobal.net

60. As a direct and proximate result of defendant's actions, plaintiff has incurred and will continue to incur attorney's fees and costs in pursuing this action.

## IV. PRAYER FOR RELIEF

**WHEREFORE,** the plaintiff claims judgment against the defendants and each of them as follows:

a. Compensatory damages in an amount this court shall consider to be just, reasonable and fair, including damages for emotional distress, damage to reputation, fairly disruptive impairment of future earnings and for loss of benefits;

b. Punitive damages in an amount his court shall consider to be just, reasonable and fair;

c. Attorney fees and the costs of this action as permitted under the Connecticut FEPA Section 31-51q <u>et seq</u>.,;

d. Back pay;

e. Front pay;

f. Such other relief as this court shall consider to be fair and equitable.

THE PLAINTIFF

By: /s/ Cynthia R. Jennings
Cynthia R. Jennings, Esq., (ct21797)

15

Cynthia R. Jennings, Esq., (ct21797)
The Barrister Law Group, LLC
211 State Street, Bridgeport, CT
(203)334-4800, Fax (203) 368-6985
Email: Cynthia.Jennings@sbcglobal.net

## V. CLAIMS FOR TRIAL BY JURY

The plaintiff claims trial by jury of the issues in this case.

THE PLAINTIFF

By: /s/ Cynthia R. Jennings
Cynthia R. Jennings, Esq.,
THE BARRISTER LAW GROUP, LLC.,
211 State Street, Bridgeport, CT
(203) 334-4800, Fax (203) 368-6985
Email: Cynthia.Jennings@sbcglobal.net
Federal Bar No: ct21797