FILED

2004 MAY 27 P 2: 29

U.S. DISTRICT COURT
BRIDGEPORT, CONN

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CAROL CONNELLY**<br>**Plaintiff** | : | |
| | : | |
| **V.** | : | **CIVIL NO. 3:03CV0551(JCH)** |
| | : | |
| **IKON OFFICE SOLUTIONS, INC.**<br>**Defendant** | : | **MAY 27, 2004** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The plaintiff submits this Memorandum of Law objecting to defendant's Motion for

Summary Judgment. The instant two count Complaint was filed on March 13, 2003. The

defendant has submitted a lengthy memorandum of law in support of summary judgment

with numerous self-serving affidavits attached. The numerous affidavits further prove

that there are many genuine issues of dispute that remain.

### II.    FACTS

On November 18, 2002, Plaintiff began her employment with Defendant as a

Corporate Recruiter/Trainer for the Northeast Region, Connecticut Market Place.

1

In her capacity as a Recruiter/Trainer, Plaintiff assisted in the placement of part-time and full time employees with Connecticut businesses and taught Outsource Basic Training (OBT) classes. In or around December 2002, Plaintiff began participating in several interviews with possible candidates for the placement of a receptionist position at the law firm of Wiggin & Dana. Plaintiff conducted all of these interviews with an IKON Senior Account Manager, Ms. Kimberly La Fleur, who was the designated liaison between Wiggin & Dana and the IKON staffing service. On December 30, 2002, Plaintiff and Ms. La Fleur co-interviewed Mona Jackson, an African-American, for the receptionist position at Wiggin & Dana. During this meeting, Ms. La Fleur told Plaintiff that Wiggin & Dana was not interested in hiring any black candidates. Plaintiff told Ms. La Fleur that such conduct was discriminatory and illegal, and that she would not participate in such behavior. On January 2, 2003, Plaintiff and Tom Magel, the Milford Director of Operations, co-interviewed Karol Somers, a Caucasian. Mr. Magel ended the interview in an unusually short period of time. When Plaintiff objected to what appeared to be snap-judgement, Mr. Magel stated that Ms. Somers "need(ed) too much dental work." Also on January 2, 2003, Plaintiff and Mr. Magel co-interviewed Megan Reily, a Caucasian. Ms. Reily had offered the information that she had a pre-existing heart condition. This condition required her to see her physician monthly. Mr. Magel stated that Ms. Reily was "sexy, just what lawyers like to look at", but that he did not want to hire her because of her heart condition. On January 3, 2003, Plaintiff went to Kim Fordham, the Area Recruiting Manager, and expressed her concerns that receptionist

2

candidates for the position at Wiggin & Dana were not being assessed on the basis of

their qualifications. Ms. Fordham appeared unconcerned and asked Plaintiff to continue

sourcing for the position. On January 9, 2003, Plaintiff and Ms. La Fleur were assigned

to a training day together. Instead of work, Ms. La Fleur's conversation with Plaintiff,

included details regarding her illness related to her cancer surgery and the fact that she

was a lesbian. Plaintiff attempted to steer the conversation back to work, but to no avail.

After leaving a particular site, Ms. La Fleur began to talk about her previous relationship

with a college professor and how she had thrown a scuba tank through her windshield

when they had broken up. Plaintiff began to feel very uncomfortable and again tried to

steer the conversation back to work. Then, unannounced, Ms. La Fleur took Plaintiff to

her home and asked her to come in and meet her partner. Plaintiff refused, and asked Ms.

La Fleur to take her back to the office. On the way back, Ms. La Fleur asked Plaintiff if

she would like to "fool around" with her and her partner. At this point Plaintiff was

furious and sternly told Ms. La Fleur that she had overstepped her boundaries. Ms. La

Fleur asked Plaintiff not to say anything about the incident to her supervisor. In or

around this time, Ms. Trudy Muhibauer, the Human Resource Director for Wiggin &

Dana, insisted that she conduct the interview with Ms. La Fleur for the receptionist

position. Previously, Ms. La Fleur had been mainly responsible for hiring candidates. Ms.

Muhibauer expressed concerns that Ms. La Fleur was not selecting the correct people to

interview and wanted to have the final say in the selection process. On January 9, 2003,

Plaintiff, Ms. La Fleur and Ms. Muhibauer co-interviewed Tina Glover, an African

American, and Nicole Smith, a Caucasian. After these interviews, Ms. Muhibauer

expressed dissatisfaction with the candidates, stating that the Plaintiff and Ms. La Fleur

were bringing her candidates "from background that doesn't want to work hard." Ms. La

Fleur and Plaintiff suggested that Ms. Muhibauer might want to consider an IKON

employee, Maribell Quinnones, a woman of Hispanic descent, who was currently

working for Wiggin & Dana as a hostess. This employee had expressed interest in the

position and had appropriate background experience for the job. Ms. Muhibauer stated

that she was not acceptable because of her "energy level" and "accent". Furthermore,

Ms. Muhibauer stated, " people from that neighborhood can't change and won't change."

When Plaintiff challenged Ms. Muhibauer on this assessment, Ms. Muhibauer said, "

those people can't change, they just don't want to work. I only finished High School and

I worked my way up without a college degree. Those type of people are useless." On

January 15, 2003, Ms. Muhibauer and Ms. La Fleur, co-interviewed two candidates,

Mona Jackson, an African American, and Tina Glover, a mulatto. Ms. Muhibauer

conducted very short, curt, interviews with the two candidates, asking very few questions.

Ms. Muhibauer expressed no interest in hiring either candidate. Later that day, Ms. La

Fleur wrote an email to Mrs. Fordham stating that Plaintiff had done an outstanding job

sourcing for a person to fill (the) position in Stamford. However, much to (her) dismay,

the customer wants to continue sourcing for the "right" person." Ms. La Fleur repeated

that the situation bore "no reflection on Carol's efforts", but that " the customer is

looking for that perfect person." In or around that time, Ms. Muhibauer was scheduled to

4

interview another candidate, Annisa Maples, a mulatto, at Wiggin & Dana. While Ms.

Maples was in the waiting room, Ms. Muhibauer went out, looked at her, and stated: " I

do not have time to see you today." When confronted about this appointment, Ms.

Muhibauer falsely claimed that the interview had not been set up.  On January 16, 2003,

Ms. La Fleur confided in the Plaintiff that Ms. Muhibauer had made numerous

discriminatory statements regarding the candidates during the January 15, 2003,

interviews. Ms. La Fleur told Plaintiff that after the interviews, outside Plaintiff's

presence, Ms. Muhibauer stated that she did "not want another girl from the hood on the

front desk, wearing those muffin hats and pronouncing the firm as Wigga and Dana."

Specifically, Ms. Muhibauer stated that Ms. Jackson was "too black." She also said she

had the same problem with Ms. Glover-even though she was not "technically black, she

was too black too be hired," Ms. Muhibauer also stated that she would accept a "white

person", either "male or female."  Ms. La Fleur also confided in Plaintiff that she wanted

to tell Ms. Muhibauer that she would not participate in her discriminatory behavior, but

that she was afraid she would lose the account.  On January 17, 2003, Plaintiff again went

to her immediate supervisor, Ms. Fordham, and complained that she was being asked to

be involved in a process which discriminated against candidates. Ms. Fordham, again,

seemed uninterested and told Plaintiff to continue sourcing for the job.  On or around

January 20, 2003, Ms. La Fleur unaccountably asked Plaintiff to switch her OBT training

location from Stamford to Milford. Plaintiff was not informed why Ms. La Fleur wanted

her to change locations. To the contrary, Plaintiff told Ms. La Fleur that there was not

proper equipment to train in Milford and that it was an inappropriate move. When

Plaintiff began teaching in Milford, Ms. La Fleur started to regularly walk by the

classroom door. As it turns out, Ms. La Fleur was attempting to gather information to

carry back to Plaintiff's supervisors. This action on the part of Ms. La Fleur was taken in

order to retaliate against Plaintiff for previously opposing discriminatory conduct. On

January 22, 2003, Ms. La Fleur wrote Plaintiff an email stating that she had called

Spherion, another outsourcing operation in Connecticut, in order to find more candidates

for the position at Wiggin & Dana. In or around this time, Ms. La Fleur informed

Plaintiff that she would no longer be working on hiring for the receptionist position. Her

removal from this hiring project was in retaliation for Plaintiff's previous opposition to

discriminatory conduct.   On January 23, 2003, Plaintiff was called into a meeting with

Ms. La Fleur and Rich Silva, Director of Recruiting and Training. During this meeting,

which lasted three (3) hours, Ms. La Fleur and Mr. Silva made numerous false allegations

and threatened to give Plaintiff a written warning, which was a preliminary to being fired.

Many of the above allegations were personal attacks, including statements that Plaintiff

taught her training classes in a " militant" manner, that she couldn't retain information,

that she called Ms. La Fleur six times a day with the same question; and that Plaintiff did

not "fit" into the IKON "culture" because she was too task and deadline oriented.  During

this interrogation, Mr. Silva demanded that Plaintiff read her warning and sign it in front

of him. Plaintiff requested that she be permitted to read the warning alone. After reading

the warning, Plaintiff refuted each one of points individually. At the end of the meeting,

6

Mr. Silva agreed with Plaintiff that the warning was unjustified and tore it up. This unjustified and unprecedented interrogation was clearly aimed at inflicting emotional distress upon the Plaintiff in order to retaliate against her for her prior complaints of discrimination and in order to get her to quit. On January 24, 2003, Ms. LaFleur, in a blatant attempt to retaliate against Plaintiff for having made complaints of racial discrimination, sent a bogus complaint of sexual harassment against Plaintiff to Sarah Allen, IKON Human Resource Manager. On January 25,2003, Plaintiff sent an email to Ms. LaFleur detailing the discriminatory comments made by Ms. Muhibauer on January15, 2003, and complaining about further discriminatory conduct. Plaintiff carbon copied Kim Fordham, Richard Silva, Tom Magel and Sarah Allan on this email. On January 24, 2003, Plaintiff, with a note from her physician, took an unpaid leave of absence due to the acute emotional distress caused by the above- described retaliatory conduct, the purpose of which was to inflict severe emotional distress and force her to resign. On January 31, 2003, while Plaintiff was on leave by recommendation from her physician, Plaintiff received a letter from Sarah Allen informing her of Ms. LaFleur's bogus allegation of sexual harassment. This personal attack compounded Plaintiff's severe emotional distress. On February 26, 2003, while Plaintiff met with Mai White, the Regional Human Resources Director, whom she had sought out in order to escalate her reports of retaliation and discrimination to a higher level. In that meeting, Plaintiff detailed the Defendant's discriminatory behavior and retaliation against her. In retaliation for making complaints of racial discrimination, Ms. White ignored Plaintiff's

complaints and instead spent a significant portion of the interview detailing Ms.
LaFleur's bogus claims of sexual harassment. Plaintiff denied all of Ms. LaFleur's
allegations and told Ms. White about the January 9, 2003, incident with Ms. LaFleur. On
March 7, 2003, Ms. White sent a letter to Plaintiff, confirming the obvious, that there was
"insufficient evidence" to support Ms. LaFleur's bogus claims of sexual harassment.
However, in an obvious effort to undermine Plaintiff's credibility, Ms. White citied an
equally bogus "investigation" which uncovered "no evidence to support [Plaintiff's]
allegation" of discriminatory hiring practices or of retaliation. Furthermore Ms. White
stated that upon her return to work, Plaintiff would be reassigned to a new manager, Joe
Manglass, Area Recruiting Manager for New York City, and would be relocated to a new
home base in Stamford. This was done over Plaintiff's complaints that such actions were
punishing the victim. The Stamford office is a two-hour commute from Plaintiff's home
in Groton. On March 11, 2003, the plaintiff received an email from defendant
demanding that she return to work in Stamford. She was forced to commute two hours to
an office with no supervisor. At the same time she continued to suffer severe emotional
distress as a result of the defendant's retaliation.

## III.    ARGUMENT

## STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact that the

moving party is entitled to a judgment as a matter of law." The Court must draw all reasonable inferences in the light most favorable to the party opposing the motion, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433. Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

'[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper ' "Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997). Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

At the summary judgment stage, the Court should not make any finding as to whether [a defendants] reason was, in fact, false. Rather, the Court must determine whether, after casting all of the facts of the case in the light most favorable to [the plaintiff] and drawing all inferences from those facts in favor of [the plaintiff], a rational jury could come to the conclusion that [the defendants] justification for [a particular action] is false. Peralta V. Cendant Corp 123 F.Supp.3d 65 (2000) "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"[S]ummary judgment...is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions." Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 111, 639 A.2d 507 (1994). "A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment." Picataggio v. Romeo, 36 Conn. App. 791, 794, 654 A.2d 382 (1995). When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury  In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Appleton v Board of Education, 254 Conn. 205, 757 A.2d 1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be

believed.  Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994).  The court must

construe the evidence in the light most favorable to the party opposing summary

judgment and deny the motion unless no construction of the evidence could support

judgment in the plaintiff's favor.  Appleton, supra; Adickes v. S. H. Kress & Co., 398

U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d

Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment

Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5

F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105

(1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v.

Colwell, 214 Conn. 242, 246-47 (1990).

    A.    CONSTITUTIONAL PROTECTION OF PLAINTIFF'S SPEECH

    Connecticut General Statute section 31-51q prohibits employers from disciplining or

discharging an employee for exercising rights protected by the First Amendment to the

United States Constitution and sections 3, 4, and 14 of the Connecticut Constitution.(fn3)

The statute provides in relevant part:

> Any employer . . . who subjects any employee to discipline or discharge on
> account of the exercise by such employee of rights guaranteed by the first
> amendment to the United States Constitution or section 3, 4, or 14 of article
> first of the constitution of the state, provided that such activity does not
> substantially or materially interfere with the employee's bona fide job
> performance or the working relationship between the employee and the
> employer, shall be liable to such employee for damages caused by such
> discipline or discharge, including punitive damages, and for reasonable
> attorney's fees as part of the costs of any such action for damages.

In order to demonstrate a violation of section 31-51q, plaintiff must prove that: (1) she was exercising rights protected by the first amendment to the United States Constitution or by an equivalent provision of the Connecticut Constitution; (2) she was fired "on account of" her exercise of such rights; and (3) her exercise of first amendment or equivalent state constitutional rights did not substantially or materially interfere with her bona fide job performance or with her working relationship with her employer. *See* Gottlob v. Connecticut State Univ., 1996 WL 57087, * 3 (Conn. Super.); Daley v. Aetna Life & Casualty, 1994 WL 422642, * 2 (Conn. Super.). Essentially the plaintiff must show protected activity, adverse action, a causal relationship between the activity and the adverse action, and that the protected activity did not interfere with the central purposes of the employment relationship.

In the case at hand, the plaintiff clearly meets the criteria for an action under CGS 31-51q. Discrimination in the employment setting is certainly a matter of public concern. The plaintiff objected to the discriminatory hiring practices of the company. The plaintiff has submitted notes documenting the comments made about the candidates during the interviews. (Exhibit 6) As a result of the plaintiff's opposition to the discriminatory practices, she was put on leave pending an investigation. The defendant has disingenuously taken excerpts of the plaintiff's deposition to claim that her claim is simply that the hiring procedure is the only thing at issue. However, a thorough reading of the plaintiff's deposition and even a cursory review of the evidence reveals that the plaintiff complained about much more than simple hiring practices. She complained

about discriminatory hiring practices  (Exhibit 21, plaintiff's deposition at 261)

B.    PLAINTIFF'S SPEECH WAS A MATTER OF PUBLIC CONCERN

The United States Supreme Court, lower federal courts, and Connecticut courts have determined that an employee's statements are not constitutionally protected, and correspondingly not protected under section 31-51q, when they relate exclusively to matters concerning the employee's personal interests, as opposed to matters of public concern. Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (setting forth generally the "matter of public concern" standard); Urashka v. Griffin Hospital, 841 F.Supp. 468, 473 (D.Conn.1994) (applying standard under section 31-51q ); Schnabel v. Tyler, 230 Conn. 735, 749-50, 646 A.2d 152 (1994) (applying standard under section 31-51q ); Emerick v. Kuhn, 1995 WL 405678, * 3 (Conn. Super.) (applying standard under section 31-51q )

In Connick v. Myers, 461 U.S. at 147, 103 S.Ct. 1684 The Court continued to explain how a court should determine whether an employee was speaking on a "matter of public concern": "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." at 147-48, 103 S.Ct. 1684.

Clearly discrimination in the employment setting is a matter of **public** concern. The plaintiff spoke out NOT about personal discrimination or a matter that affected her individually, the plaintiff spoke out about the discriminatory hiring practices of the defendant.  Her complaints were not on matters of personal interest, but were on matters

that affect the public at large.  The plaintiff could have sat back and allowed the

discriminatory practices and would likely not have suffered adverse employment actions.

Instead, the plaintiff spoke out about the discrimination.

C.    PLAINTIFF SUFFERED ADVERSE EMPLOYMENT ACTIONS

"Adverse employment actions including discharge, refusal to hire, refusal to

promote, demotion, reduction in pay, and reprimand...[A]dverse employment actions may

include negative evaluation letters, express accusations of lying, assignment of

lunchroom duty, reduction of class preparation periods, failure to process...insurance

forms, transfer from library to classroom teaching as an alleged demotion and assignment

to classroom on fifth floor which aggravated teacher's physical disabilities."   Rutan v.

Republican Party, 497 U.S. 62, 75 (1990); Bernheim v. Litt, 79 F.3d 318, 324-26 (2d Cir.

1996); Kaluczky v. City of White Plains, 57 F.3d 202, 208 (2d Cir. 1995).

In the case at hand, the plaintiff was not allowed to return to work after April 4,

2003. (exhibit 25, plaintiff's deposition at 290)  The plaintiff was instructed to call in

every Monday to see if she should return to work.  (ibid)  At present, the plaintiff has not

been authorized to return to work.  The plaintiff was paid for two months after she was

out of work. (ibid)  The plaintiff was also the subject of an investigation during the time

she has been out of work.  During the plaintiff's leave, the defendant claims to have

eliminated the plaintiff's position. (ibid)  The defendant conveniently omits this adverse

action in the pending motion for summary judgment.  Placing an employee on leave and

"eliminating" their position while they are out certainly amounts to an adverse employment action.

### D.      PLAINTIFF'S CHOICE OF CAUSE OF ACTION

The defendant now attempts to misconstrue the plaintiff's claim completely. The plaintiff complained about discrimination of OTHERS. The fact that there is also a retaliation element to the plaintiff's claims does not limit her cause of action to CFEPA. Even if CHRO/EEOC have jurisdiction over the plaintiff's claims, exhaustion is not required where the administrative agency cannot provide all of the requested relief. In Catalano v. Bedford Associates, Inc., 9 F.Supp.2d 133, 135 (D.Conn.1998), this Court addressed this same argument and held:

In discrimination cases under the CFEPA, Connecticut's Superior Courts are split over application of an "adequate administrative remedy" exception to the exhaustion doctrine. The Connecticut Supreme Court has not addressed this issue. The plaintiff's remedies under CFEPA are limited. Under CGS 31-51q, the plaintiff is entitled to punitive damages as well as compensatory damages. Under CFEPA, the plaintiff is limited to compensatory damages.

Aside from this issue, the plaintiff's cause of action is proper under CGS 31-51q. The plaintiff is able to make a prima facie case and has evidence of a violation of the statute. The mere fact that another cause of action or remedy is available to the plaintiff does not preclude her from bringing this cause of action.

E.    <u>DEFENDANT IS NOT ENTITLED TO COSTS UNDER CGS §31-51Q</u>

The present action was not brought with such an absence of substantial

justification as to warrant an award of costs and attorney's fees.  The plaintiff has dealt

with all the issues raised by the defendant in the previous sections of this opposition.

F.    <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

The defendants have moved for summary judgment.  They argue that the conduct

alleged by the plaintiff is not, as a matter of law, sufficiently "extreme and outrageous" to

constitute the tort of intentional infliction of emotional distress.  A careful reading of the

plaintiff's deposition demonstrates, however, more than enough factual support for the

proposition that the conduct of the defendants was "extreme and outrageous" as that term

has been defined by the Connecticut courts.  See, e.g., <u>Petyan v. Ellis</u>, 200 Conn. 243,

246 (1986).

Whether the conduct alleged by plaintiff was "extreme and outrageous" within the

meaning of established law is a jury question, and the court should not usurp the role of

the jury unless no reading of the facts alleged by the plaintiff could constitute the tort.  As

the court held in <u>Mascia v. Faulkner</u>, No. 349036, pp. 12-13 (New Haven J. D. 1995)

(Fracasse, J.): "Summary judgment is inappropriate for issues involving 'motive, intent

and subjective feelings and reactions,' <u>United Oil Co. v. Urban Redevelopment</u>

<u>Commission</u>, 158 Conn. 364, 376.  [Defendant's] intent, whether the conduct was

extreme and outrageous, whether [defendant's] conduct caused the [plaintiffs'] distress,

16

and the severity of the [plaintiffs'] distress are all genuine issues of material fact for the jury." Cf., e.g., <u>Berry v. Loyseau</u>, 223 Conn. 786, 807 (1992); <u>Mather v. Griffin Hospital</u>, 207 Conn. 125, 138 (1988); <u>Gilman v. Gilman</u>, 46 Conn. Sup. 21, 23 (1999); <u>Lugo v. Rodriguez</u>, 8 CSCR 244 (1992); <u>Hansen v. Berger, Lehman Assoc.</u>, 9 CSCR 1243, 12 Conn. L. Rptr. No. 17, 555 (1994). See also <u>Batick v. Seymour</u>, 186 Conn. 632, 646-47 (1982). Courts in sister jurisdictions take the same position. E.g., <u>Shubbe-Hirt v. Baccigalupi</u>, 94 F.3d 111 (3d Cir. 1996); <u>Halio v. Lurie</u>, 15 A.D.2d 62, 222 N.Y.S.2d 759, 764 (2d Dept. 1961); <u>Murphy v. Murphy</u>, 486 N.Y.S.2d 457, 459 (3d Dept. 1985); <u>Flatley v. Hartmann</u>, 138 A.D.2d 345, 525 N.Y.S.2d 637, 638 (2d Dept. 1988); <u>Richard v. Armon</u>, 144 A.D.2d 1, 4, 536 N.Y.S.2d 1014, 1016 (2d Dept. 1989); <u>Collins v. Willcox Inc.</u>, 158 Misc.2d 54, 57, 600 N.Y.S.2d 884, 886 (N.Y. County, 1992).

Many courts have held facts no more offensive than those alleged here to be sufficiently "extreme and outrageous" to meet that element of the wrong. In <u>Berry v. Loyseau</u>, 223 Conn. 786 (1992), an employee was threatened by one employer and assaulted by another. In <u>Whelan v. Whelan</u>, 41 Conn. Sup. 519, a husband had falsely told his wife he was suffering from AIDS. In <u>Brown v. Ellis</u>, 40 Conn. Sup. 165 (1984), the plaintiff's job supervisor had given him work assignments in disregard of his fear of heights.

"An additional consideration in determining whether extreme and outrageous behavior exists is whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity; behavior that otherwise might be considered merely rude, abrasive or inconsiderate may be deemed outrageous if the

defendant knows that the plaintiff is particularly susceptible to emotional turmoil."
Honaker v. Smith, 256 F.3d 477, 492 (7th Cir. 2001).

In Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17 (1991), the plaintiff's
supervisor had taunted him about his alcoholism. In Centi v. Lexington Health Care
Center, 1997 Conn. Super. LEXIS 1202 (Licari, J.), the court held that the actions of the
defendant in terminating the plaintiff's employment were sufficiently extreme and
outrageous to be submitted to a jury for determination because the termination of
employment was accompanied by a change of work assignments, the setting of
unrealistic goals for the employee, the supervisor's coming to the employee's house on a
Sunday, and the giving of pretextual reasons for termination. In Gilman v. Gilman, 46
Conn. Sup. 21 (1999), the defendant had telephoned the police and falsely reported that
her ex-husband was smoking marijuana in his house, at a time when she knew he was
entertaining a new girlfriend, resulting in disruption of their dinner. In Nance v. M.D.
Health Plan, Inc., 47 F. Supp. 2d 276 (D. Conn. 1999), the court held that an employer's
questioning that signaled to others its belief that the plaintiff was a homosexual could be
found sufficiently "extreme and outrageous" in the eyes of a jury to constitute a basis for
a finding of intentional infliction of emotional distress. In Caesar v. Hartford Hospital,
46 F. Supp. 2d 174 (D. Conn. 1999), the court held that an employer's acts in
discriminating against the plaintiff and making false reports regarding her to the
Department of Public Health were sufficiently "extreme and outrageous" to state a claim
for intentional infliction of emotional distress. In Kennedy v. Coca-Cola Bottling Co. of

New York, Inc., 170 F. Supp. 2d 294, 298 (D. Conn. 2001), the court held that the actions

of an employer in disclosing to the employees and supervisors involved in wrongdoing

the plaintiff's complaints that they had engaged in a variety of illegal or improper

activities at the workplace, with the result that the plaintiff suffered retaliation and

harassment, was conduct sufficiently "extreme and outrageous" to go to a jury.  In

McKelvie v. Cooper, 190 F.3d 58 (2d Cir. 1999), the Second Circuit, applying

Connecticut law, held that the alleged actions of police officers in abusing the patron of a

bar during a search of the premises could be found by a jury to be sufficiently extreme

and outrageous to warrant a verdict in the plaintiff's favor.  In Moss v. Town of East

Haven, 2001 WL 1002684, at *2 (Conn. Super. 2001), the court held that a police

officer's conduct at the plaintiff's home in threatening the plaintiff "with his hand on his

exposed service revolver" while not allowing the plaintiff to leave, was sufficiently

"extreme and outrageous" to warrant submitting the action to a jury's determination.  In

Bell v. Board of Education, 55 Conn. App. 200 (1999), the court held that allegations that

the defendant imposed a system of education which created a pervasive atmosphere of

fear and terror in an elementary school classroom over a two-year period adequately

alleged conduct which a jury could find was "extreme and outrageous".   In Appleton v.

Board of Education, 254 Conn. 205 (2000), the Supreme Court cited Bell with approval.

Appleton held that an employer's actions in "condescending" to the plaintiff, suggesting

to her daughter that she should "take a few days off from work" and having her escorted

off the premises by police did not reach the minimum standard articulated in Bell and

other cases for conduct which is "extreme and outrageous". See also Baird v. Rose, 192 F.3d 462 (4th Cir. 1999), holding that the actions of a school teacher in humiliating a student in class because of her clinical depression was "extreme and outrageous" under Virginia law. In Rosten v. Circuit Wise, Inc., 7 C.S.C.R. 1147 (1992), an employer discharged the plaintiff because of her union organizing activities. In Lugo v. Rodriguez, 8 C.S.C.R. 244 (1992), an attorney intentionally delayed in releasing a lis pendens. Breach of an oral agreement to restructure a loan was held sufficiently extreme and outrageous in Connecticut National Bank v. Montanari, 9 CSCR 196 (1994). Surveillance by an insurance company to determine the validity of a claim was held sufficiently extreme and outrageous to withstand a motion to dismiss in Bosco v. MacDonald, 13 Conn. L. Rptr. No. 10, 312 (1995). In a similar case, the United States Court of Appeals for the First Circuit, applying Connecticut law, held that a union officer's conduct over a period of three weeks in driving by a union member's home several times a day and following him when he left his house was sufficiently extreme and outrageous to support a jury verdict in the member's favor. Johnson v. Teamsters Local 559, 102 F.3d 21 (1st Cir. 1996). A job supervisor's false accusation of lying, made in the presence of one of the plaintiff's fellow employees, is sufficiently "extreme and outrageous" to warrant submitting the case to the jury. Musacchio v. Cooperative Educational Services, 1995 WL 681664, 1 Conn. Ops. 1319 (1995). Cf., Decampos v. Kennedy Center, Inc., 1990 WL 264687 at * 4 (1990). A cause of action for intentional infliction of emotional distress was stated in an employment context when the plaintiff

alleged that his supervisor "severely harassed and mistreated [him], and created a situation where he was denied effective assistance in the performance of his job, open communication and fairness, unfairly placed on a 60-day performance improvement plan and then constructively fired." Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 310-11 (D. Conn. 2000). An allegation that an employer framed an employee for theft, terminated her with that as an excuse, and then publicly branded her a thief was sufficiently extreme and outrageous to survive a motion to strike in White v. Thornton Oil Corp., 32 Conn. L. Rptr. No. 14, 505 (2002). The action of a police officer in sending a taunting Christmas card to a pretrial detainee at the Hartford Correctional Center was sufficiently "extreme and outrageous" to survive a motion to strike. Johnson v. Martin, 2 Conn. Ops. 764, 1996 WL 383351, at *3 (Conn. Super. 1996) (Sheldon, J.). In Talit v. Peterson, 44 Conn. Sup. 490, 497-98 (1997) (Blue, J.), the allegation that the defendants had subjected the plaintiff, a coworker, to unjustified criticism and caused her to lose her job for filing a grievance was held sufficiently extreme and outrageous to survive a motion to strike. The disputed allegation that the defendant physicians had falsely reported to police that the plaintiff had physically abused his wife, causing the plaintiff to be arrested, were potentially sufficiently extreme and outrageous to require denial of a motion for summary judgment in Pantaleo v. Ravski, 19 Conn. L. Rptr. No. 1, 28 (1997) (Silbert, J.). Terminating an employee in retaliation for his union activities has been held to be sufficiently "extreme and outrageous" to support a jury verdict and award of substantial damages for intentional infliction of emotional distress. Mihalick v.

Cavanaugh, 26 F. Supp. 2d 391, 396 (D. Conn. 1998). The action of a school official in falsely reporting suspected child abuse to the Department of Children and Families was held sufficiently "extreme and outrageous" to survive a motion for summary judgment in Chain v. Biddle, No. CV-97-0407047 (N.H. Sup. Ct. 1999) (Licari, J.); and to survive a Motion to Strike in Greco v. Anderson, 28 Conn. L. Rptr. No. 17, 605 (2001) (Shortall, J.). Assigning the plaintiff to a work station close to that of a co-employee who had threatened her and whom she feared was held sufficiently "extreme and outrageous" to survive a motion to strike in Karanda v. Pratt & Whitney Aircraft, 24 Conn. L. Rptr. 521 (1999). All of these cases found the conduct alleged to be such that a jury representing a fair cross-section of the community should determine whether it was "extreme and outrageous" as required by the law. Ultimately, it is a community standards test that applies. For a court to strike a complaint at the pleading stage, or to grant summary judgment prior to trial, constitutes a judicial determination as a matter of law that the alleged conduct is acceptable in our society. In any case where it is not obvious that the conduct is acceptable, the court should defer to the collective wisdom of the jury. Faraclas v. Botwick, 32 Conn. L. Rptr. No. 11, 414 (2002).

Other jurisdictions agree with Connecticut's prevailing view that a very wide range of human interaction, when presented as the tort of intentional infliction of emotional distress, can withstand a motion to dismiss. E.g., Newby v. Alto Riviera Apartments, 60 Cal. App. 3d 288, 131 Cal. Rptr. 547 (1976) (a landlord's threats to evict a tenant for organizing other tenants); Alcorn v. Anbro Engineering, Inc., 2 Cal. 3d 493,

468 P.2d 216 (1970) (racial taunting by a supervisor); <u>Contreras v. Crown Zellerbach Corp.</u>, 88 Wash. 2d 735, 741 (1977) (racial jokes by a supervisor); <u>Carroll v. Beyeriche Landesbank</u>, 125 F. Supp. 2d 58 (S.D.N.Y. 2000) (sexual harassment of a female employee); <u>Patterson v. Xerox Corp.</u> 901 F. Supp. 274, 279 (N.D. Ill. 1995) (harassment of pregnant employee by supervisor) <u>Pavilon v. Kaferly</u>, 204 Ill. App. 3d 235, 149 Ill. Dec. 549, 561 N.E.2d 1245, 1251 (1990) (employer pressured employee for dates, offered her money for sexual favors, and threatened to rape or kill her); <u>Milton v. Illinois Bell Tel. Co.</u>, 101 Ill. App. 3d 75, 56 Ill. Dec. 497, 427 N.E.2d 829, 832 (1981) (employer engaged in pattern of harassing employee to force her to falsify work reports); <u>Mejia v. City of New York</u>, 119 F. Supp. 2d 232, 285-86 (E.D.N.Y. 2000) (racial remarks by a police officer ) The court also held that a lower standard for outrageousness applies when the defendant is a public official, like a police officer, because misconduct by one in a position of power is by its very nature more offensive than similar misconduct by a private citizen.; <u>Brown v. Muhlenberg Township</u>, 269 F.3d 205 (3d Cir. 2001) (police officer shot plaintiff's dog); <u>Bundren v. Superior Court</u>, 145 Cal. App. 3d 784, 791 (1983) (hospital's attempt to collect debt while debtor was still hospitalized); <u>Wilson v. Monarch Paper Co.</u>, 939 F.2d 1138 (5th Cir. 1991) (reassigning a college-educated executive to perform janitorial duties); <u>Mroz v. Lee</u>, 5 F.3d 1016 (6th Cir. 1993) (defamation); <u>Shubbe-Hirt v. Baccigalupi</u>, 94 F.3d 111 (3d Cir. 1996) (supervisor's verbal abuse of female subordinate after telling fellow supervisors he was going to "trim her bush"); <u>Ross v. Saint Augustine's College</u>, 103 F.3d 338 (4th Cir. 1996) (faculty

retaliation against student for testifying on behalf of a professor in a reverse discrimination case); <u>Jackson v. Brown</u>, 904 P.2d 685 (Utah 1995) (groom's last-minute cancellation of wedding).  This court does not "sit as a seventh juror."  The plaintiff has a right to have a jury determine whether the conduct in question is sufficiently outrageous to justify an award of damages.  <u>Berry v. Loyseau</u>, supra, 223 Conn. at 807; <u>Mather v. Griffin</u> Hospital, 207 Conn. 125, 138 (1988).

The plaintiff in her deposition gave detailed information about her emotional distress.  The plaintiff on many occasions took unpaid leaves of absence. (Exhibit 22, plaintiff's deposition at 277-278)  The leaves were taken after consultation with her medical doctor, Dr. Ramirez.   The plaintiff was physically unable to go to work because of the retaliation she was suffering at the hands of the employer. (ibid)

Finally, as to the claim that there is insufficient evidence of actual emotional distress in this case, Connecticut law is clear that medical evidence is not necessary to support a judgment for emotional distress damages.  The credible testimony of the victim is sufficient.  <u>Berry v. Loiseau</u>, 223 Conn. 786, 811, 614 A.2d 414 (1992); <u>Schanzer v. United Technologies Corp.</u>, 120 F. Supp. 2d 200, 217 (D. Conn. 2000).  In <u>Opielowski-Brouwer v. Haddam Hills Academy</u>, 31 Conn. L. Rptr. No. 6, 193 (2002) (Shapiro, J.), the court refused to reduce a jury's award of $260,000 for emotional distress caused by an employer's verbally threatening and abusive conduct during the plaintiff's wrongful termination from employment, in the absence of any medical evidence.  Emotional distress consisting of a loss of joy in the everyday events of life, characterized by no

24

longer singing in the shower, with no professional attention whatsoever, is sufficient not only to establish this element of the tort but to support a substantial six-figure jury award. <u>DeLaurentis v. City of New Haven</u>, 220 Conn. 225, 597 A.2d 807 (1991).

**CONCLUSION**

For the reasons stated above, the plaintiff respectfully requests that the motion for summary judgment be denied.

BY:
THE PLAINTIFF
CYNTHIA R. JENNINGS, ESQ. (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street, 2nd Floor
Bridgeport, CT 06604
HER ATTORNEY

25

## **CERTIFICATION**

This is to certify that a copy of the foregoing Memorandum of Law in Support of

Plaintiff's Objection to Defendant's Motion for Summary Judgment has been mailed,

postage prepaid, on May 27, 2004.

Margaret Strange, Esq.,
Holly Cini, Esq.,
Jackson Lewis, LLP
55 Farmington Ave.
Hartford, CT 06105

CYNTHIA R. JENNINGS, ESQ.