UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CAROL CONNELLY : | |
|     PLAINTIFF, : | CIVIL ACTION NO. |
| : | 3:03-cv-551 (JCH) |
| v. : | |
| : | MARCH 7, 2005 |
| IKON OFFICE : | |
| SOLUTIONS, INC., : | |
|     DEFENDANT. : | |

**RULING ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [DKT. NO. 29]**

Defendant IKON Office Solutions, Inc. ("IKON") brings this motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. IKON argues that they are entitled to judgment as a matter of law on plaintiff's claims of retaliation, pursuant to CONN. GEN. STAT. § 31-51q, and intentional infliction of emotional distress because plaintiff raises no material issues of fact as to several elements of these claims. Plaintiff Carol Connelly opposes the motion. For the reasons that follow, IKON's motion for summary judgment is **GRANTED**.

**I.    BACKGROUND**[1]

Carol Connelly began working at IKON as a Corporate Recruiter/Trainer for the Northeast Region, Connecticut Market Place, on November 18, 2002. Her duties included placement of part-time and full-time employees, as well as teaching Outsource Basic Training classes. In December 2002, Connelly was assigned the task of finding a receptionist for the law firm of Wiggin & Dana. She worked on this assignment with

---

[1]The facts in this section are taken from Connelly's Memorandum of Law in Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment, and the admissions and affirmative assertions of facts in dispute found in her D. Conn. Local R. Civ. P. 56(a)(2) Statement.

Kimberly LaFleur, an IKON Senior Account Manager and the designated liaison between IKON and Wiggin & Dana.

On December 30, 2002, Connelly and LaFleur interviewed Mona Jackson, an African-American woman. According to Connelly, during this meeting, LaFleur told Connelly that Wiggin & Dana was not interested in hiring an African-American to be its receptionist. Connelly protested that she would not participate in any discriminatory or illegal hiring activities.

On January 2, 2003, Connelly and Milford Director of Operations Tom Magel interviewed Karol Somers, a Caucasian, for the Wiggin & Dana receptionist position. Magel concluded this interview in an unusually short period of time, stating that Somers needed "too much dental work." Connelly protested what she felt was a snap judgment on Magel's part. Connelly and Magel also interviewed Megan Reily for the receptionist position, but Magel, while commenting that Reily was "sexy, just what lawyers like to look at," rejected Reily because of a pre-existing heart condition that Magel felt might keep Reily out of work. On January 3, 2003, Connelly approached Kim Fordham, IKON's Area Recruiting Manager, and expressed her concerns that candidates for the receptionist position at Wiggin & Dana were being assessed based on inappropriate criteria.

On January 9, 2003, Connelly and LaFleur were assigned to train together. According to Connelly, during their time training together LaFleur spoke about her physical illness and about the fact that LaFleur was a lesbian, despite Connelly's attempts to steer the conversation back to work-related topics. Additionally, according to Connelly, LaFleur propositioned Connelly on the way back to the office. Connelly

rejected LaFleur's advances.

At this point Trudy Muhibauer, Human Resources Director at Wiggin & Dana, insisted that she participate in the receptionist hiring process with LaFleur. On January 9, 2003, Muhibauer, LaFleur, and Connelly participated in an interview with Tina Glover, an African-American, and Nicole Smith, a Caucasian. Afterwards, Muhibauer complained that IKON was bringing her unacceptable candidates "from [a] background that doesn't want to work hard." Memorandum of Law in Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment ("Mem. Opp. Summ. J.") at 4. When Connelly and LaFleur suggested a candidate of Hispanic decent that already worked at Wiggin & Dana as a hostess, Muhibauer rejected the idea, stating that the candidate's "energy level" and "accent" were unacceptable. See id. Furthermore, Connelly recalls Muhibauer stating that:

> . . . people from that neighborhood can't change and won't change . . . those people can't change, they just don't want to work. I only finished High School and I worked my way up without a college degree. Those type of people are useless.

Id.

On January 15, LaFleur and Muhibauer interviewed two more candidates, one African-American and one mulatto, but did not hire either one. Soon thereafter Muhibauer refused to see a mulatto candidate, claiming that the candidate did not have an appointment. According to Connelly, LaFleur came to her on January 16, 2003 and told her that Muhibauer had made a number of discriminatory statements to LaFleur including statements that several candidates were "too black" to be hired, that Muhibauer would accept white candidates of either gender, and that Muhibauer did "not

-3-

want another girl from the hood on the front desk, wearing those muffin hats and pronouncing the firm as Wigga and Dana." Id. at 5.

Connelly again went to speak with Kim Fordham and complained that Connelly was being asked to be involved in a discriminatory hiring process.[2]  Fordham directed Connelly to continue to perform her duties and did not seem interested in Connelly's complaints.

On January 20, 2003, LaFleur asked Connelly to change the location of her training session from Stamford, Connecticut to Milford, Connecticut.  Despite Connelly's objection that the location did not have the proper equipment, Connelly began teaching her classes in Milford.  Connelly noticed that while she taught, LaFleur would periodically pass by her classroom, allegedly to gather information to carry back to LaFleur's superiors.  On January 22, 2003, LaFleur told Connelly that she had hired an outside agency to hire a candidate for the Wiggin & Dana receptionist position.  Connelly was removed from this hiring project.

On January 23, 2003, Connelly met with LaFleur and IKON Director of Recruiting and Training Rich Silva for three hours.  During that meeting LaFleur and Silva discussed allegations made by other IKON employees against Connelly and discussed a written "Employee Counseling Report" containing these allegations.  See Plaintiff's

---

[2] Connelly admits, however, that the overwhelming number of candidates interviewed for the Wiggin & Dana receptionist position were African-American, the three finalists for the position were African-American, and the individual hired was African-American.  See Plaintiff's Local Rule 9 (c)(2) Statement at 2, ¶¶ 24, 27-28.

Local Rule 9 (c)(2) Statement[3] at 1, ¶¶ 7-8 ("Pl's Rule 56"). Connelly asserts that this report was a warning, contained numerous false allegations and personal attacks, and was a preliminary step to her being fired. At the conclusion of the meeting, Silva ripped up the Employee Counseling Report, stated that the meeting should not have taken place, and both he and LaFleur apologized to Connelly. See id. at 1, ¶¶ 9-10.

The next day Connelly began an unpaid leave of absence. On January 25, 2003, Connelly contacted IKON Human Resources Manager Sarah Allen and complained the January 23 meeting was "unmerited, unjust, insulting and harassment." Pl's Rule 56 at 1, ¶ 12. On January 31, 2003, Allen informed Connelly that LaFleur had made a sexual harassment claim against Connelly.

On February 26, 2003, Connelly met with IKON Regional Human Resources Director Mai White and discussed LaFleur's sexual harassment claim against Connelly, Connelly's claims of sexual harassment against LaFleur, and Connelly's claims that IKON was behaving in a discriminatory manner and retaliating against Connelly for speaking out about it. On March 7, 2003, White sent Connelly a letter that stated that an investigation had determined that there was insufficient evidence to confirm either LaFleur's or Connelly's charges of sexual harassment, or Connelly's charges of discriminatory practices or retaliation.

Connelly states that, upon her return to work, IKON assigned her to the Stamford office, a two hour commute from her home in Groton, Connecticut, in order to retaliate against her. See Mem. Opp. Summ. J. at 8. However, Connelly admits that it was she

---

[3] The Local Rules of the District of Connecticut have been amended. The rule regarding summary judgment motions is now found in Local Rule 56.

who requested a transfer to a new worksite and requested a new supervisor. See Pl's Rule 56 at 4, ¶ 65. In fact, Connelly admits that she was "happy" and "excited" about her transfer, and that IKON offered to allow her to remain at the Milford location if she should so choose. See id. at 4, ¶¶ 69-70.

Additionally, Connelly affirmatively states in her Rule 56(a)(2) Statement that she was not fired by IKON, received full pay from IKON until June 2003, continues to receive her health benefits from IKON, and "never had any adverse employment action taken against her during her whole time employed by IKON Office Solutions, Inc." See id. at 7, ¶¶ 20-21. Connelly initiated this action against IKON in Connecticut Superior Court on March 13, 2003. See id. at 4, ¶ 78. IKON removed to this court on March 27, 2003. See id.

## II.     STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See, FED.R.CIV.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'" Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992). After

discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). See also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. See Securities & Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Nor may she rest on the "mere allegations or denials" contained in her pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible). Litigants in the District of Connecticut must comply with Local Rule 56 which requires a party opposing summary judgment to clearly list each disputed material issue of fact and cite to admissible evidence in the record to support each fact, or risk entry of summary judgment against them. See D.

CONN. LOC. R. CIV. P. 56.

## III.   DISCUSSION

Connelly brings two claims in this action. First, she claims that IKON retaliated against her for exercising her First Amendment rights in violation of CONN. GEN. STAT. § 31-51q. Second, she charges IKON with intentional infliction of emotional distress based on its actions towards her during her period of employment with IKON.

### A.   Retaliation - CONN. GEN. STAT. § 31-51q

In order to maintain a claim of retaliation under CONN. GEN. STAT. § 31-51q, Connelly must prove:

> (1) [she] was exercising rights protected by the first amendment to the United States Constitution (or an equivalent provision of the Connecticut constitution); (2) [she] . . . [suffered an adverse employment action] on account of [her] exercise of such rights; and (3) [her] exercise of [her] first amendment (or equivalent state constitutional rights) [sic] did not substantially or materially interfere with [her] bona fide job performance or with [her] working relationship with [her] employer.

Lowe v. Amerigas, Inc., 52 F.Supp.2d 349, 359 (D.Conn. 1999), *aff'd*, 208 F.3d 203 (2d Cir. 2000). As Connelly herself phrases it, "[e]ssentially the plaintiff must show protected activity, adverse action, a causal relationship between the activity and the adverse action, and that the protected activity did not interfere with the central purposes of the employment relationship." Mem. Opp. Summ. J. at 12.

IKON asserts that Connelly fails to make a sufficient showing on these three elements. First, IKON argues that Connelly was not engaging in protected speech when she complained about discriminatory hiring practices at IKON and Wiggin & Dana. According to IKON, Connelly's speech did not relate to matters of public concern

and only related to private matters concerning the terms of her employment.  See Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment at 17 ("Mem. Supp. Summ. J.")  Second, IKON argues that Connelly failed to plead, let alone make a sufficient factual showing, that her speech did not interfere with her employment relationship.  See Mem. Supp. Summ. J. at 22-24.  Finally, IKON argues that Connelly cannot establish that she suffered at adverse employment action at the hands of IKON as a result of engaging in protected speech.  See id. at 24.  In fact, in its Reply Memorandum, IKON points out that Connelly admits in her Rule 56(a)(2) Statement that she suffered no adverse employment action during her employment with IKON.  See Defendant's Reply Memorandum in Support of its Motion for Summary Judgment at 1 ("Def's Reply Mem.")  The last two elements Connelly must prove, adverse action and non-interference, are dispositive in this case.

### 1. Adverse Employment Action

As Connelly clearly admits in her Memorandum in Opposition at page 12, she must make a showing that she suffered adverse action[4] as a result of her engaging in protected speech.  See Lowe, 52 F.Supp.2d at 359.  However, she clearly states in her 56(a)(2) Statement of Material Facts in Dispute:

> 20.   Plaintiff was at no time terminated from Ikon Office Solutions, Inc. (See Exhibit 23) Plaintiff received full pay up and until June, 2003. (See Exhibit 24) Plaintiff continues to receive health benefits from Ikon Office Solutions, Inc.  Plaintiff's only reason for not returning to work is due to Sarah Allen, a supervisor at Ikon Office Solutions,

---

[4]Specifically, section 31-51q holds employers liable if they "subject[ ] any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of [Connecticut] . . . ."  CONN. GEN. STAT. § 31-51q.

> Inc. telling not [sic] to return until a full investigation is finished.[5]
> (See Exhibit 25)
>
> 21.  Plaintiff never had any adverse employment action taken against her during her whole time employed by Ikon Office Solutions, Inc. . . . In fact, Plaintiff has a promotion recommendation by Joe Manglass in her file.  (See Exhibit 26)

Pl's Rule 56 at 7, ¶¶ 20-21.

The only claim of adverse employment action found in Connelly's Memorandum in Opposition is that IKON suspended Connelly in April 2003, and eliminated her position several months later.  See Mem. Opp. Summ. J. at 14.  However, this occurred only *after* Connelly filed suit on March 13, 2003 alleging violation of section 31-51q.[6] Therefore, this action could not have been the basis for Connelly's claim.

Did IKON discipline Connelly in some other way?[7]  Connelly, in her recitation of the facts, refers to several other incidents in which IKON allegedly "retaliated" against her for engaging in protected speech.  While the court will assume the necessary "disciplinary intent," the actions described by Connelly do not, as a matter of law, rise to the level of disciplinary action.

Connelly claims IKON retaliated against her by having her meet with Silva and LaFleur for three hours regarding complaints from fellow employees.  However,

---

[5] In fact, earlier in her Rule 56(a)(2) Statement, Connelly admits that she did not return to work after June 11, 2003 on the advice of her attorney.  See Pl's Rule 56 at 4, ¶ 73.

[6] The court notes that Connelly's Amended Complaint, filed on April 27, 2004, is the operative complaint in this action.  However, the Amended Complaint does not allege that Connelly was suspended, or that her position was eliminated, by IKON.

[7] Although Connelly makes no argument in her Memorandum in Opposition that IKON's other actions constituted discipline, the court, in order to be thorough, will briefly examine other factual allegations made by Connelly.

Connelly admits that, following their discussions, Silva ripped up the allegedly disciplinary document and both he and LaFleur apologized to Connelly for holding the meeting. Pl's Rule 56 at 1, ¶¶ 9-10. This cannot constitute discipline. Connelly was paid for the time she spent in the meeting, suffered no adverse result from the meeting, and even received an apology.

Also, Connelly refers to LaFleur's sexual harassment claims against Connelly as retaliatory. IKON investigated these claims, found them to be factually unsupported, and informed Connelly of that finding. IKON cannot be said to be disciplining Connelly for exonerating her of sexual harassment charges brought by a co-worker. Additionally, Connelly claims IKON retaliated against her by transferring her to an office farther from her residence. However, Connelly admits that she requested a transfer following the three-hour meeting regarding co-worker complaints and LaFleur's sexual harassment allegations, and admits that she was "happy" and "excited" about the transfer. See id. at 4, ¶¶ 65, 70. This is not discipline.

Connelly also claims that LaFleur retaliated against her by assigning her to train in a location without the correct equipment, and then walking past her classroom door in an attempt to gather information against Connelly for use by her superiors. However, supervision by one's superiors is not discipline, see, e.g., Smith v. Union Oil Co. of California, Civil Action No. C-73-1636 WHO, 1977 WL 77, at *32 (N.D. Cal. August 22, 1977) (co-workers and supervisor "watching everything plaintiff did" and "building a file" does not constitute retaliatory employment practice), unless the pattern of supervision is oppressive, see, e.g., Francis v. American Tel. & Tel. Co., 55 F.R.D. 202, 207 (D.D.C. 1972) (employee that was constantly watched, her every movement documented, was

subject to oppressive supervision). In this case, Connelly alleges that LaFleur walked past the open training room door a few times. This does not rise to the level of constant, oppressive supervision, and is not "discipline" as a matter of law.

Once again, Connelly clearly stated that she suffered no adverse employment action at IKON. She has made no attempt to date to amend or correct this statement, or to amend her complaint following the submission of her Memorandum in Opposition and Rule 56(a)(2) Statement. Therefore, she has failed to offer admissible proof that a reasonable jury could rely upon to find in her favor on this element.

### 2. Interference with Job Performance or Employment Relationship

Additionally, Connelly fails to allege, let alone offer evidence, that her exercise of constitutionally protected rights did not substantially or materially interfere with her job performance or employment relationship. Connelly failed to allege this element in her Amended Complaint. Also, despite IKON raising this as a basis for summary judgment and Connelly enumerating this element in her Memorandum in Opposition, Connelly inexplicably fails to address it in any way. Connelly has failed to come forward with any evidence that would raise a material issue of fact on this element.

Connelly has failed to offer sufficient evidence on two elements of her claim under section 31-51q to create a material issue of fact. Therefore, IKON's motion for summary judgment on this claim is granted. See Celotex, 477 U.S. at 323.

### B. Intentional Infliction of Emotional Distress

In order to maintain her claim for intentional infliction of emotional distress under Connecticut law, Connelly must show that 1) IKON intended to inflict emotional distress

on her or knew, or should have known, that emotional distress was the likely result of its actions; 2) that IKON's conduct was extreme and outrageous; 3) that IKON's conduct is the cause of Connelly's emotional distress; and 4) that the emotional distress sustained is severe. See Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 210 (2000). Whether IKON's conduct was extreme and outrageous is the initial question for the court to address. See id. "Only where reasonable minds disagree does it become an issue for the jury." Id.

To be extreme and outrageous, IKON's conduct must exceed "all bounds usually tolerated by decent society . . . ." See id. (quotation omitted). In fact,

> [l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Id. (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d, 73 (1965)). IKON asserts that it did not engage in any extreme or outrageous conduct and that reasonable minds cannot disagree in this situation. IKON points out that Connelly, in her Memorandum in Opposition, fails to provide any facts on which she bases her claim of "extreme and outrageous" conduct. See Def's Reply Memo. at 9. She merely states that "a careful reading of plaintiff's deposition" will demonstrate facts sufficient for a jury to find extreme and outrageous conduct. Mem. Opp. Summ. J. at 16.

Furthermore, IKON argues, even if the court attempts to surmise the factual incidents Connelly would rely upon to make her factual showing, no evidence can be

-13-

found in the record that would raise an issue of fact on the high standard for extreme and outrageous conduct. See Def's Reply Memo. at 9-10. IKON asserts that the apparent bases of Connelly's claim are the unnecessary three-hour meeting, with Silva and LaFleur, concerning allegedly false co-worker complaints and a written warning, after which Silva tore up the warning and both Silva and LaFleur apologized to Connelly; LaFleur's sexual harassment allegations; Connelly being asked to train in a location without the proper equipment; LaFleur's alleged "spying" on Connelly at that location; IKON officials' ignoring Connelly's complaints regarding problems with the Wiggin & Dana hiring process; and Connelly's transfer to a new location within her assigned district that lengthened her commute, despite her admission that she requested a transfer. See Mem. Supp. Summ. J. at 32. IKON argues that even if these allegations are taken as true, they do not, as a matter of law, amount to "extreme and outrageous" conduct.

Taking the facts in a light most favorable to Connelly, the court finds that, as a matter of law, Connelly's allegations do not rise to the level of "extreme and outrageous" conduct. While IKON's actions might be offensive, insulting, or hurtful, see Appleton, 254 Conn. at 211, no reasonable member of the community could view them as "atrocious, and utterly intolerable in a civilized community," id. None of the numerous cases cited by Connelly suggest a different conclusion.

Connelly has failed to offer sufficient proof that IKON's actions toward her were "extreme and outrageous." Therefore, IKON's motion for summary judgment on Connelly's claim for intentional infliction of emotional distress is granted.

IV.  **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [Dkt. No. 29] is **GRANTED** as to all counts. The clerk is ordered to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 7th day of March, 2005.

                                          /s/ Janet C. Hall
                                        Janet C. Hall
                                        United States District Judge